Philip AKA, Special Administrator of
the Estate of Evangeline Aka *v.*
JEFFERSON HOSPITAL ASSOCIATION, INC.,
d/b/a Jefferson Regional Medical Center;
Kimberly Garner, M.D.; Betty Orange, M.D.;
Randy Hill, M.D.; Shane Higginbotham, M.D.;
Herbert Fendley, M.D.; William Freeman, M.D.; Harvie M.
Attwood, M.D.; and St. Paul
Fire & Marine Insurance Company, Inc.

99-1366 42 S.W.3d 508

Supreme Court of Arkansas
Opinion delivered May 10, 2001
[Petition for rehearing (separate appellees Herbert Fendley, M.D.,
*et al.*) denied*; petition for rehearing (separate appellees Kimberly
Garner, M.D., *et al.*) denied; petition for rehearing (appellee St.
Paul Fire & Marine Insurance Company) denied.†]

---

* BROWN and THORNTON, JJ., would grant as to estate of Baby Boy Aka.
† BROWN and THORNTON, JJ., would grant as to estate of Baby Boy Aka.

630

*Eubanks, Welch, Baker & Schulze,* by: *Morgan E. Welch;* and *Cross, Kearney & McKissic,* by: *Gene McKissic,* for appellant/cross-appellee.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.,* by: *R. T. Beard, III,* and *Tim E. Howell,* for appellees Kimberley Garner, M.D.; Shane Higginbotham, M.D.; and Randy Hill, M.D.

*Womack, Landis, Phelps, McNeill & McDaniel,* by: *Paul McNeill* and *Mark Mayfield,* for appellees/cross-appellants Herbert Findley, M.D.; William Freeman, M.D.; and Harve M. Attwood, M.D.

*Anderson, Murphy & Hopkins, L.L.P.,* by: *Overton S. Anderson,* for appellee Erma Washington, M.D.

*Friday, Eldredge & Clark, LLP,* by: *Phil Malcom* and *John C. Fendley, Jr.,* for appellees Betty Orange, M.D., and Erma Washington, M.D., & Associates.

*Bridges, Young, Matthews & Drake PLC,* by: *Stephen A. Matthews,* for appellee/cross-appellant St Paul Fire & Marine Insurance Company.

*Charles M. Kester* and *Christopher R. Heil,* for *amicus curiae* Arkansas Trial Lawyers Association.

Williams & Anderson LLP, by: *Leon Holmes,* for *amicus curiae* Arkansas Right to Life, Inc.

W.H. "DUB" ARNOLD, Chief Justice. The Court of Appeals certified this first-impression case for us to consider appellant's arguments urging the reversal of precedent. Specifically, appellant asks this court to overrule our holding in *Chatelain v. Kelley*, 322 Ark. 517, 910 S.W.2d 215 (1995), that a viable fetus is not a "person" within the meaning of Arkansas's wrongful-death statute. *See* Ark. Code Ann. § 16-62-102 (1987 & Supp. 1999). Our jurisdiction is authorized pursuant to Ark. R. Sup. Ct. 1-2(a)(1), 1-2(b)(3) and (4), and 1-2(d) (2000). We find merit in appellant's arguments, and we reverse and remand for further action consistent with this opinion.

On September 6, 1996, appellant, Philip Aka, as the Special Administrator of the Estate of Evangeline Aka, appellant's thirty-four-year-old wife and the mother of two children, and as the Special Administrator of the Estate of Baby Boy Aka, their unborn son, filed a medical-negligence complaint against Jefferson Hospital Association, Inc., d/b/a Jefferson Regional Medical Center ("JRMC"); Kimberly Garner, M.D., a licensed physician practicing at the UAMS/AHEC-Pine Bluff Residency Training Program at JRMC ("AHEC"); Erma Washington, M.D., a licensed obstetrician and gynecologist employed by Erma Washington, M.D., and Associates, P.A., with JRMC obstetrical privileges; Betty Orange, M.D., a licensed obstetrician and gynecologist, also possessing JRMC obstetrical privileges; Randy Hill, M.D., a licensed physician practicing at AHEC; and Shane Higginbotham, M.D., a licensed physician practicing at AHEC. On July 28, 1997, appellant filed an amended complaint adding as named defendants St. Paul Fire & Marine Insurance Company, Inc., and three AHEC faculty supervisors, Herbert Fendley, M.D., William Freeman, M.D., and Harvie M. Attwood, M.D. Appellant filed his second amended complaint against appellees on November 20, 1998.

Essentially, appellant's complaint alleged that the defendant doctors' and institutions' medical negligence in unnecessarily inducing his wife's labor, failing to discontinue the induction, failing to perform a cesarean section, failing to resuscitate her or the unborn baby, and failing to obtain informed consent, proximately caused Mrs. Aka's and her unborn son's deaths. Appellant also averred that JRMC's, AHEC's, and AHEC's faculty supervisors' failure to train and supervise AHEC resident physicians proximately caused both deaths.

*Background*

On December 11, 1995, at approximately 7:00 p.m., Evangeline Aka was admitted for the induction of labor to the Family Practice Center, a resident-in-training program operated at JRMC by UAMS/AHEC pursuant to an "affiliation agreement." As of 10:00 p.m. on December 12, twenty-seven hours after her admission, Mrs. Aka had failed to progress in labor. Consequently, Cheryl Jones, a registered nurse in JRMC's labor and delivery department, telephoned Dr. Erma Washington at home. According to Jones, she notified Dr. Washington that although Dr. Betty Orange was listed on the patient's chart as the "consult" and the physician authorizing Mrs. Aka's induction, she believed that Dr. Orange was "on call" for Dr. Washington. She also reported that Dr. Orange had not seen the patient. In fact, Nurse Jones testified that she did not believe any attending obstetrical physician from the Family Practice Clinic had seen Mrs. Aka while Jones was tending her on the night of December 12, 1995.

According to Nurse Jones, Dr. Washington initially instructed her to prepare Mrs. Aka for a cesarean section. However, ten minutes after their first phone call, Dr. Washington called and canceled her orders for the c-section, directed the resident physicians to rupture the patient's membrane, and ordered medication. Following those instructions, first-year resident Dr. Shane Higginbotham made multiple attempts to rupture Mrs. Aka's membrane. At trial, Dr. Higginbotham acknowledged that if a patient, like Mrs. Aka, failed to progress in labor and was on Pitocin, a drug given to induce labor, the risk of needing a c-section increased. However, Dr. Higginbotham admitted that he lacked the technical skills to perform a c-section and could not have done so even had it been necessary to save Mrs. Aka and her baby. Dr. Higginbotham also related that between 7:00 and 10:00 p.m., he was the only Family Practice resident in the building working in obstetrics and that no doctor with c-section privileges was there to attend Mrs. Aka between 7:00 and 10:30 when he personally attempted to rupture her membrane.

After failing to rupture Mrs. Aka's membrane, Dr. Higginbotham called Dr. Washington who told him to call a third-year resident physician, Dr. Randy Hill, for assistance. Dr. Hill also failed in his attempts to rupture Mrs. Aka's membrane. Moreover, Mrs. Aka complained of mild dyspnea, shortness of breath, while the resident applied fundal pressure to place a fetal-scalp electrode.

Apparently, the dyspnea resolved after the fundal pressure was relieved.

Approximately an hour-and-a-half later, Mrs. Aka complained of acute shortness of breath. According to Dr. Higginbotham, Mrs. Aka suffered respiratory distress and was "going into respiratory failure." He also reported that when the "code" was called on Mrs. Aka, there was not a board-certified obstetrician in the labor-and-delivery suite, and no board-certified physician had been called to assist Mrs. Aka. Dr. Hill, as the senior resident physician, took over. Per Dr. Hill's suggestion, Dr. Higginbotham "scrubbed" to prepare for a possible c-section. Dr. Washington arrived during the code, but no attempts were made to deliver the baby.

At approximately 1:15 a.m on December 13, 1995, Evangeline Aka, and her unborn son died at appellee-hospital JRMC. The autopsy denoted Mrs. Aka's cause of death as "amniotic fluid embolism" and her unborn son was described in forensic patholo-gist Dr. Frank Peretti's report as a "well-developed, well nour-ished," "full term male infant" weighing eight pounds, fifteen ounces with "[n]o evidence of congenital malformations, natural disease, trauma or infection." Mrs. Aka's November 30, 1995 obstetrical ultrasound report indicated that her fetal evaluation was complete and that she carried a full term "viable single intrauterine fetus" with"[n]o complication identified."[1]

Following the deaths of Mrs. Aka and her unborn son, appel-lant made a series of phone calls, including two answering-machine messages, to Drs. Washington and Orange. The doctors complained to the Pine Bluff police department and swore out warrants against appellant. Ultimately, appellant was prosecuted for terroristic threatening. However, following a two-day jury trial, he was acquitted of all criminal charges.

In response to appellant's medical-negligence action, Dr. Washington and Erma Washington, M.D., and Associates, P.A. filed a motion for partial summary judgment on the basis of governmen-tal immunity from suit because Washington was a "part-time" twenty-five-percent consultant for the AHEC residency-training program. However, Dr. Washington also engaged in a full-time private obstetrical practice. In part, Washington also contended that summary judgment was appropriate because she had no insurance

---

[1] Notably, appellees do not contest that Baby Boy Aka was a viable fetus.

coverage for her part-time work, and her state insurance coverage had been canceled.

The parties disagreed as to the nature of any legal relationship between Drs. Orange and Washington. At a minimum, Dr. Orange leased office space from Dr. Washington. However, some evidence suggested that Dr. Orange had a contractual agreement with Dr. Washington, and appellant claimed that Dr. Orange was actually an employee of Erma Washington, M.D., and Associates, P.A. For example, appellant insisted that Dr. Washington was actually on-call for Dr. Orange the evening Mrs. Aka died and was only contacted because Dr. Orange was identified on the patient's chart as having authorized the induction. For her part, Dr. Orange admitted that she occasionally consulted with the AHEC resident physicians but conceded that she was not a state employee.

Consequently, appellant argued that Dr. Washington treated Mrs. Aka under the initial presumption that she was Dr. Orange's private patient. Given appellant's theory that Dr. Washington's cancellation of the c-section procedure proximately caused the deaths of Mrs. Aka and her unborn baby, appellant maintained that the question of what "hat" Dr. Washington was wearing — state or private employee — remained a question for the jury. The trial court disagreed and dismissed both Dr. Washington and Erma Washington, M.D., and Associates, P.A. from the suit.

The remainder of the case was tried before a jury from January 28, 1999, to February 16, 1999. Following two days of deliberations, the jury returned a verdict in favor of all defendants. Appellant filed a motion for a new trial, which was denied on April 22, 1999. Aka then brought the instant appeal challenging: (1) the trial court's order granting partial summary judgment against the estate of Baby Boy Aka pursuant to *Chatelain v. Kelley*, 322 Ark. 517, 910 S.W.2d 215 (1995); (2) the trial court's order granting summary judgment and immunity to Dr. Washington and her professional association based upon her part-time state employment; (3) the sufficiency of the evidence supporting the jury's verdict; and (4) the trial court's rulings excluding an autopsy photograph and related testimony, evidence of prior complaints about the AHEC residency-training program, and certain testimony regarding Candace Stewart, a second-year resident physician with AHEC. The Arkansas Trial Lawyers Association and Arkansas Right to Life, Inc., also filed *amicus* briefs in support of appellant's arguments urging us to overrule *Chatelain v. Kelley*. On cross-appeal, appellee-doctors Herbert Fendley, William Freeman, and Harvie M. Attwood contend that the trial court erred by improperly admitting testimony of

prior complaints about the AHEC family-practice, residency-training program.

■ Before addressing the merits of the instant appeal, we consider appellant's pending motion to supplement the addendum. During preparation for oral argument, appellant discovered that copies of certain enumerated items were inadvertently omitted from the addendum, including the trial court's April 22, 1999 order denying appellant's motion for new trial and the second page of a transcript excerpt concerning the admissibility of an autopsy photograph. We recognize that appellant is not seeking to amend the addendum but to ensure that this court has complete copies of all items currently indexed. Accordingly, we grant appellant's motion.

### I. Partial summary judgment against Estate of Baby Boy Aka

#### A. Chatelain v. Kelley

The trial court granted partial summary judgment against the Estate of Baby Boy Aka on the basis of *Chatelain v. Kelley*, 322 Ark. 517, 910 S.W.2d 215 (1995). For his first point on appeal, appellant urges us to reexamine our four-three decision holding that a viable fetus is not a "person" pursuant to Arkansas's wrongful-death statute. *Chatelain*, 322 Ark. at 525, 910 S.W.2d at 219. In *Chatelain*, this court reasoned that judicial expansion of the wrongful-death statute to include a fetus was inappropriate because the issue was a matter of "legislative prerogative" and would be contrary to then-existing probate and criminal laws. However, appellant and *amici curiae* contend that this decision must be overruled to effectuate the remedial purposes of the wrongful-death statute, to bring Arkansas in line with the majority of states that have considered the issue[2], and, most

---

[2] Thirty-two jurisdictions permit a wrongful-death action on behalf of a viable fetus. (Of those thirty-two jurisdictions, four permit an action for an unviable fetus (Connecticut, Missouri, South Dakota, and West Virginia)). Four jurisdictions permit an action, even for unviable fetuses, but have a live birth or stillbirth requirement (Louisiana, Maryland, Oklahoma, and Pennsylvania). One jurisdiction permits an alternative remedy by allowing an action for damages resulting in stillbirth caused by negligence (Florida). One jurisdiction noted in dicta that a wrongful-death action might be permitted but declined to reach the merits on procedural grounds (Utah). Three jurisdictions prohibit an action for an unborn nonviable fetus but have not reached the issue of whether a viable fetus may maintain an action (Alaska, Oregon, and Rhode Island). Four jurisdictions have no case law on the issue (Colorado, Guam, Puerto Rico, and Wyoming). Only nine jurisdictions, including Arkansas, reject a wrongful-death action for a viable fetus.

importantly, to honor subsequent legislative developments suggesting that a viable fetus is a "person."

■ In part, appellees counter Aka's argument on procedural grounds. Specifically, appellees claim that we are barred from considering the merits of this point on appeal because Aka failed to designate the partial-summary-judgment dismissal in his notice of appeal. We reject appellees' argument. Appellant's notice of appeal stated that the appeal was taken from "the jury verdict returned February 17, 1999, in favor of the defendants, the Judgment filed March 8, 1999, pertaining to said verdict, and the Court's Order filed April 22, 1999, denying Plaintiff's Motion for New Trial." Significantly, Ark. R. App. P.—Civ. 2(b) (2000) provides that any appeal from "any final order also brings up for review any intermediate order involving the merits and necessarily affecting the judgment." In light of the foregoing, we find that appellant's notice of appeal was adequate to preserve appellate review of the trial court's intermediate order dismissing the claims regarding the Estate of Baby Boy Aka.

We now address the merits of appellant's argument. Given our strong reliance upon prior judicial decisions and legislative intent in deciding *Chatelain*, we must first reexamine that opinion's underpinnings. In *Chatelain*, we discussed three specific cases presenting this court with the issue of whether a fetus was a legally recognized "person." First, in *Carpenter v. Logan*, 281 Ark. 184, 662 S.W.2d 808 (1984), we affirmed a probate court's finding that it was without authority to order the administration of the estate of an unborn fetus, and we declined to hold that an unborn or stillborn fetus was a deceased person within the meaning of the probate code.

Second, in *Carpenter v. Bishop*, 290 Ark. 424, 720 S.W.2d 299 (1986), we were precluded from reaching the ultimate issue of whether a viable fetus, born dead, was a "person" because the underlying suit was barred by the parental-immunity doctrine. Third, in *Meadows v. State*, 291 Ark. 105, 722 S.W.2d 584 (1987), we determined that a fetus was not a "person" as that term was used in the criminal manslaughter law. Notably, our construction in *Meadows* turned upon the common-law definition of "person," which did not include a fetus, because the term "person" had not been statutorily defined. *Id.*, 291 Ark. at 107-108, 722 S.W.2d at 585.

Relying on these cases, *Carpenter, Bishop,* and most heavily upon *Meadows*, the majority of this court concluded in *Chatelain* that a decision to include fetus in the definition of person would

"create an inconsistency in the laws of this State by holding 'person' included viable fetus for the purpose of the wrongful death statute when we have reached the contrary conclusion in the criminal law and the law of probate." *Chatelain*, 322 Ark. at 525, 910 S.W.2d at 219.

In response, the dissent criticized the majority for adopting a minority-jurisdiction rule that could lead to the illogical result of barring recovery for a stillborn child but not for one born alive. *Id.*, 322 Ark. at 527, 910 S.W.2d at 220 (GLAZE, J., dissenting). The dissent maintained that Arkansas's wrongful-death statute must be construed liberally to accomplish its remedial objective and to be in accord with the Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113 (1973), which upheld a state's legitimate interest in protecting potential life at viability, the time when a fetus has the capability of meaningful life outside the womb. *Id.*, 322 Ark. at 527-28, 910 S.W.2d at 220-21 (GLAZE, J., dissenting).

As appellant and the *amicus* briefs point out, *Chatelain* invited a legislative response. *Id.*, 322 Ark. at 525, 910 S.W.2d at 219. More importantly, the legislature has responded. For example, during the trial of this matter, the legislature adopted Act 1273 of 1999, amending Ark. Code Ann. section 5-1-102, by adding the following definition to "person" in the context of criminal offenses:

> (13)(B)(i)(a) For the purposes of §§ 5-10-101 — 5-10-105 ["Homicide"], "person" also includes an unborn child in utero at any stage of development;
> (b) "Unborn child" means a living fetus of twelve (12) weeks or greater gestation.
> (ii) EXCEPTIONS. Subdivision 13(b) does not apply to:
> (a) Acts which cause the death of an unborn child in utero if those acts were committed during a legal abortion to which the woman consented;
> (b) Acts which are committed pursuant to usual and customary standards of medical practice during diagnostic testing or therapeutic treatment; and
> (c) Acts which are committed in the course of medical research, experimental medicine, or acts deemed necessary to save the life or preserve the health of the mother.

Ark. Code Ann. § 5-1-102(13)(B)(i), (ii) (Supp. 1999).

■ Given this amended definition of "person," the legislature plainly affords protection to unborn viable fetuses[3], assuming injury or death occurred without the mother's consent to a lawful abortion or outside the "usual and customary standards of medical practice" or beyond "acts deemed necessary to save" the mother's life. The relevance of the legislature's response, by statutorily defining person in the criminal context to include a fetus, cannot be understated given our strong reliance in *Chatelain* upon *Meadows*. The *Meadows* decision was predicated upon the lack of legislative guidance in defining the term "person." As a result, this court was obliged to turn to the common-law definition of person, which did not include a viable fetus. *Meadows*, 291 Ark. at 107-108, 722 S.W.2d at 585. Act 1273 of 1999 is consistent with Amendment 68 to the Arkansas Constitution, and if there had been any doubt concerning the State's public policy on this subject, it is now laid to rest. We are no longer constrained by the common-law definition of person.

The people's passage of Amendment 68 in 1988 reflected the stated public policy of Arkansas. Amendment 68 declares that "[t]he policy of Arkansas is to protect the life of every unborn child from conception until birth, *to the extent permitted by the Federal Constitution*." Ark. Const. amend. 68, § 2 (emphasis added). We are mindful that the federal courts enjoined the enforcement of Amendment 68 and held it unconstitutional because its provision that no public funds will be used to pay for abortions except to save the life of the mother violated the 1994 Hyde Amendment. *See* Ark. Const. amend. 68, § 1; *Little Rock Family Planning Servs. v. Dalton*, 860 F. Supp. 609 (E.D. Ark. 1994), *aff'd*, *Little Rock Family Planning Servs. v. Dalton*, 60 F.3d 497 (8th Cir. 1995) (holding that Amendment 68's prohibition of the use of public funds for abortions except to save the mother's life violated the federal Medicaid statute, as amended by the 1994 Hyde Amendment, and was invalid under the supremacy clause); *but see Little Rock Family Planning Servs.*, 60 F.3d at 504-505 (BOWMAN, J., concurring in part and dissenting in part).

However, the United States Supreme Court reversed the Eighth Circuit and held that Amendment 68 could be enjoined only to the extent that it imposed obligations inconsistent with Title XIX. *See Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 476 (1996). Accordingly, the Supreme Court reversed the

---

[3] Appellant also points out that Arkansas law enhances responsibility for the crime of battery if the victim is pregnant. *See* Ark. Code Ann. § 5-13-201(5) (Repl. 1997). Notably, the first-degree-battery statute makes no mention of the fetus's viability.

decision below insofar as it affirmed a blanket invalidation of Amendment 68. The Court noted that in such a preemption case, state law is displaced only " 'to the extent that it actually conflicts with federal law.' " *Id.* (citing *Pacific Gas & Elec. Co. v. State Energy Resources Conserv. & Dev. Comm'n*, 461 U.S. 190, 204 (1983); *Gade v. National Solid Wastes Management Assn.*, 505 U.S. 88, 109 (1992); and *Exxon Corp. v. Hunt*, 475 U.S. 355, 376 (1986). " '[T]he rule [is] that a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it.' " *Id.* (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502 (1985).

■ Accordingly, the import of Amendment 68 remains a compelling expression of Arkansas's public policy "to the extent" it does not violate federal law. Ark. Const. amend. 68, § 2. By federal constitutional interpretation, the state's interest in protecting the life of a fetus begins at viability. *See Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992) (plurality) (holding that a state may promote its interest in the potentiality of human life subsequent to viability, even by regulating or proscribing abortion); *Roe*, 410 U.S. 113 (holding that viability is the point when the independent existence of a fetus can be the object of state protection).

■ Our decision in *Chatelain* was premised upon avoiding inconsistency. *Chatelain*, 322 Ark. at 525, 910 S.W.2d at 219. Now, to be consistent with the current expression of legislative intent,[4] we must depart from *Chatelain*. As a general rule, we are bound to follow prior case law under the doctrine of *stare decisis*, a policy designed to lend predictability and stability to the law. *State Office of Child Support Enforcem't v. Mitchell*, 330 Ark. 338, 343, 954 S.W.2d 907 (1997) (citing *Parish v. Pitts*, 244 Ark. 1239, 1252, 429 S.W.2d 45, 52 (1968) (superseded by statute on other grounds)). Indeed, it is well-settled that "[p]recedent governs until it gives a result so patently wrong, so manifestly unjust, that a break becomes unavoidable." *Mitchell*, 330 Ark. at 343 (quoting *Parish*, 244 Ark. at 1252). Our test is whether adherence to the rule would result in "great injury or injustice." *Mitchell*, 330 Ark. at 343 (quoting *Independence Fed. Bank v. Webber*, 302 Ark. 324, 331, 789 S.W.2d 725, 730 (1990)). Here, we must conclude that the expressed public policy of the General Assembly justifies a break from precedent. Accordingly,

---

[4] Significantly, following the submission of this appeal, the legislature amended Ark. Code Ann. section 16-62-102(a) to include viable fetus in the definition of person for wrongful-death actions. *See* Act 1265 of 2001 (approved April 4, 2001). The legislature also designated a deceased viable fetus a decedent for purposes of the probate code. *See* Act 1775 of 2001 (approved April 18, 2001).

we overrule *Chatelain v. Kelley*, 322 Ark. 517, 910 S.W.2d 215 (1995).

*B. Retroactive or prospective application*

■ The next question that arises is whether our decision to overrule *Chatelain* should be applied retroactively or prospectively. As we stated recently in *Bean v. Office of Child Support Enfcm't*, 340 Ark. 286, 9 S.W.3d 520 (2000), our rule on this point could not be more clear; retroactivity is a matter of legislative intent. Generally, we observe a strict rule of statutory construction against retroactive operation and presume that the legislature intends for statutes and amendments to be applied prospectively. However, this rule does not ordinarily apply to procedural or remedial legislation. *Bean*, 340 Ark. at 297, 9 S.W.3d at 526 (citing *Gannett Rover States Publ'g Co. v. Arkansas Industrial Dev. Comm'n*, 303 Ark. 684, 799 S.W.2d 543 (1990); *Forrest City Mach. Works v. Aderhold*, 273 Ark. 33, 616 S.W.2d 720 (1981)). The majority of jurisdictions maintain that wrongful-death statutes are remedial in nature and should, therefore, be interpreted liberally to accomplish the "purposes of compensating injured persons and deterring harmful conduct." *See Chatelain*, 322 Ark. at 519, 910 S.W.2d at 216 (citing *Volk v. Baldazo*, 651 P.2d 11 (Idaho 1982)).

■■ We have observed the cardinal principle for construing remedial legislation by giving appropriate regard to the spirit that promoted a statute's enactment, the mischief sought to be abolished, and the remedy proposed. *Bean*, 340 Ark. at 297, 9 S.W.3d at 526 (internal citations omitted). Finally, we have held that retroactive application is appropriate for remedial statutes that "do not disturb vested rights, or create new obligations, but only supply a new or more appropriate remedy to enforce an existing right or obligation." *Id.*; *see also Harrison v. Matthews*, 235 Ark. 915, 362 S.W.2d 704 (1962).

■ When this court overrules a prior decision and states the rule to be followed in the future, we also acknowledge the need to rely upon the validity of actions taken in faith upon the old decision. *See Wiles v. Wiles*, 289 Ark. 340, 711 S.W.2d 789 (1986); *Crisco v. Murdock Acceptance Corp.*, 222 Ark. 127, 258 S.W.2d 551 (1953). However, given that the overruling of a decision relates back to the date of the overruled decision, we have also observed that no matter how a new rule of law is applied, the benefit of the new decision is denied to some injured persons. *See Taliafero v. Barnett*, 47 Ark. 359, 1 S.W. 702 (1886); *Parish*, 244 Ark. at 1254, 429 S.W.2d at 53.

■ Consequently, we adhere to the doctrine announced in *Parish* and make the new rule applicable only to the case at bar and to causes of action arising after the decision becomes final. *See Wawak v. Stewart*, 247 Ark. 1093, 449 S.W.2d 922 (1970). In other words, the court's opinion is effectively prospective except as to the instant case. In *Parish*, we explained that:

> [t]his serves, in keeping with our system of the private enforcement of legal rights, to reward the present plaintiff for her industry, expense and effort, and for having given this Court the opportunity to rid the body of our law of this unjust rule.

*Id.*, 244 Ark. at 1254, 429 S.W.2d at 52. Indeed, were the exception not applicable to the litigant urging departure from precedent, there would be no reason for such a party to devote the required time, effort, and money to raise an attack upon existing unsound precedents. *Id.*

■ In sum, we conclude that appellant's efforts to bring about a needed change in the law should not go unrewarded, because without such inducement change might not occur. *See Special Sch. Dist. of Ft. Smith v. Sebastian Co.*, 277 Ark. 326, 331, 641 S.W.2d 702, 705 (1982) (citing *Parish*, 244 Ark. 1239, 429 S.W.2d 45). In light of the foregoing and to further the remedial intent of the wrongful-death statute, we apply our decision to overrule *Chatelain* retroactively as to appellant and prospectively as to causes of action arising after this opinion becomes final. Therefore, we reverse the trial court's grant of partial summary judgment against the Estate of Baby Boy Aka.

## II. Summary judgment and immunity

■ The next major issue before us concerns the trial court's grant of immunity and summary judgment to Dr. Erma Washington and Erma Washington, M.D., and Associates, P.A., based upon her part-time state employment. In reviewing a summary-judgment case, we need only decide if the trial court's grant of summary judgment was appropriate based on whether the evidence presented by the moving parties, Dr. Washington and her employer, left a material question of fact unanswered. Notably, the moving party always bears the burden of sustaining a motion for summary judgment. All proof must be viewed in the light most favorable to the resisting party, and any doubts must be resolved against the moving party. However, the moving party is entitled to

summary judgment if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Ark. R. Civ. P. 56 (2000); *Robert D. Holloway, Inc. v. Pine Ridge Add'n Resid. Prop. Owners,* 332 Ark. 450, 453, 966 S.W.2d 241, 243 (1998) (citing *McCutchen v. Huckabee,* 328 Ark. 202, 943 S.W.2d 225 (1997)).

 ██ Once the moving party makes a *prima facie* showing that it is entitled to summary judgment, the opponent must meet proof with proof by showing a material issue of fact. *Dillard v. Resolution Trust Corp.,* 308 Ark. 357, 359, 824 S.W.2d 387, 388 (1992). If a moving party fails to offer proof on a controverted issue, summary judgment is not appropriate, regardless of whether the nonmoving party presents the court with any countervailing evidence. *Collyard v. American Home Ins. Co.,* 271 Ark. 228, 230, 607 S.W.2d 666, 668 (1980). Here, Dr. Washington claimed immunity from suit based upon her part-time state employment. Accordingly, our review must focus, first, on an issue of law, namely, whether the trial court properly granted Dr. Washington immunity, and, second, on whether there remains any genuine issue of material fact precluding summary judgment.

 Article 5, section 20, of the Arkansas Constitution provides that "[t]he State of Arkansas shall never be made defendant in any of her courts." Ark. Const. art. 5, § 20, grants sovereign immunity and a general prohibition against awards of money damages in lawsuits against the State of Arkansas and its institutions. *Cross v. American Livestock & Poultry Comm'n,* 328 Ark. 255, 258, 943 S.W.2d 230, 232 (1997) (citing *Smith v. Denton,* 320 Ark. 253, 895 S.W.2d 550 (1995); *Fireman's Ins. Co. v. Arkansas State Claims Comm'n,* 301 Ark. 451, 784 S.W.2d 771, *cert. denied,* 498 U.S. 824 (1990)). The doctrine of sovereign immunity is rigid, and, as such, the immunity may be waived only in limited circumstances. *Id.,* 328 Ark. at 258-59, 943 S.W.2d at 232 (citing *State v. Staton,* 325 Ark. 341, 934 S.W.2d 478 (1996)). Thus, where the suit is one against the State and there has been no waiver of immunity, the trial court acquires no jurisdiction. *Id.*

Here, the trial court found that Dr. Washington was, at all relevant times, acting as a uninsured contract employee by supervising family-practice residents for the State of Arkansas. Accordingly, she was granted immunity from suit. Appellant counters that Dr. Washington wore at least two "hats" on the evening Mrs. Aka died. As a result, he posits that the question of which hat Dr. Washington

was wearing is an issue for the jury to resolve. We agree. Genuine issues of material fact remain unresolved regarding whether Dr. Washington acted as a private practitioner or as an uninsured state employee.

First, appellant offered evidence that Dr. Washington had been selected through appellant's health-insurance carrier as Mrs. Aka's private obstetrician. Other testimony indicated that Dr. Washington was on call for Dr. Orange pursuant to a contractual arrangement, and Dr. Orange was identified on the patient's chart as the physician ordering the induction procedure. Moreover, testimony indicated that Dr. Washington was not initially contacted by a resident, per her state obligation, but by a nurse. Appellant argues that Dr. Washington treated Mrs. Aka as an UAMS/AHEC patient only after talking with Dr. Orange and concluding that Mrs. Aka was not a private patient. At that point, Dr. Washington canceled the c-section. Thus, the record lends support to appellant's theory that for some period of time Dr. Washington may have been unaware of what hat she was wearing. This, of course, creates a fact question for the jury.

■■ In considering the trial court's decision, we have held that the standard is not whether evidence is sufficient to compel a conclusion on the part of the fact-finder but whether there is evidence sufficient to raise a fact issue. *See Wallace v. Broyles*, 322 Ark. 189, 961 S.W.2d 712 (1998). Here, appellant presented evidence sufficient to raise a factual issue regarding Dr. Washington's role as a state employee or private practitioner. Viewing the evidence in the light most favorable to appellant and resolving any doubts against Dr. Washington and Erma Washington, M.D., and Associates, P.A., we cannot say that summary judgment was warranted. Accordingly, we reverse the trial court's order granting summary judgment.

### III. Other evidentiary issues

#### A. Exclusion of autopsy photograph and related testimony

■■ Appellant next challenges the trial court's decision to exclude an autopsy photograph and Dr. Frank Peretti's related testimony. The decision to admit evidence is within the trial court's discretion. On appeal, we will not reverse a trial court's ruling on the admission of evidence absent an abuse of that discretion nor will we reverse absent a showing of prejudice. *Misskelley v. State*, 323

Ark. 449, 915 S.W.2d 702 (1996), *cert. denied*, 117 S. Ct. 246 (1996). Arkansas Rule of Evidence 403 provides for the exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time. Although evidence is relevant, it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

██ ██ Absent an abuse of discretion, this court will not reverse a trial court for admitting photographs. *Jones v. State*, 329 Ark. 62, 65, 947 S.W.2d 339, *cert. denied*, 118 S. Ct. 574 (1997). In *Jones*, we specifically addressed the guideposts for determining whether a trial court has abused its discretion. We noted that although the relevancy and admission of photographs is a matter within the sound discretion of the trial court and that we are highly deferential to that discretion, we have rejected a *carte blanche* approach to the admission of photographs. *Id.* (citing *Carmago v. State*, 327 Ark. 631, 940 S.W.2d 631 (1997) (internal citations omitted)). In making the admission determination, we require a trial court to consider, first, whether the relevant evidence creates a danger of unfair prejudice, and, second, whether the danger of unfair prejudice substantially outweighs its probative value. *Id.*, 329 Ark. at 66, 947 S.W.2d at 341.

██ Importantly, after applying the Rule 403 balancing test, we have held that:

> . . . even the most gruesome photographs may be admissible if they tend to shed light on any issue, to corroborate testimony, or if they are essential in proving a necessary element of a case, are useful to enable a witness to testify more effectively, or enable the jury to better understand the testimony. Other acceptable purposes are to show the condition of the victim's bodies, the probable type or location of the injuries, and the position in which the bodies were discovered. Of course, if a photograph serves no valid purpose and could only be used to inflame the jury's passions, it should be excluded.

*Id.*

Here, appellant offered expert testimony that the resident physicians' attempts to rupture Mrs. Aka's membrane were the events causing the onset of amniotic fluid embolism, the cause of her death. During Dr. Peretti's testimony, appellant sought to admit a

photograph taken during Dr. Peretti's autopsy of Mrs. Aka. Dr. Peretti testified that at the time of his examination, he did not recall seeing any injury, tear, damage, separation, or laceration to the placenta. After being shown the photograph at issue, however, he acknowledged that a laceration was evident in the picture. Appellees objected to Dr. Peretti's testimony and to the photograph's admission on the basis of "surprise."

The trial court granted appellees' motion to exclude both the photograph and Dr. Peretti's testimony, reasoning that the evidence would probably cause prejudice and was just "announced and discovered over the weekend or yesterday between [appellant and his counsel]." Significantly, the objectionable photograph was supplied to all parties prior to Dr. Peretti's testimony at trial. Given that the photograph was capable of authentication and previously supplied to all the parties, we conclude that the trial court abused its discretion by excluding the photograph. We cannot say that the danger of unfair prejudice outweighed the photograph's probative value. However, we agree that the trial court properly struck Dr. Peretti's testimony on the basis of surprise.

## B. Exclusion of prior complaints

Appellant argues that he was prejudiced by the trial court's inconsistent rulings regarding the admission of witness testimony of prior complaints about the resident-training program's lack of faculty supervision. Although the trial court admitted the testimony of Nurse Gail Parker, it excluded the proffered testimony of Dr. Sterling Roaf, a local obstetrician, part-time consultant to the residency program, and the chairperson of JRMC's Credentials Committee.

Nurse Parker testified as to the complaints she knew of and that she had made personally, including complaints to Dr. Roaf. She expressed her concerns that the family-practice residents were not getting the necessary guidance from their supervisors and that nurses were left to call for help when the residents would not do so. Dr. Roaf's proffered testimony corroborated Nurse Parker's account. He offered detailed complaints that he had received, including allegations that residents were "doing things" they were not authorized to do and that they were not adequately supervised.

Appellees objected to the testimony of both witnesses and succeeded in excluding Dr. Roaf's on the basis of Ark. R. Evid. 403. When we review the trial court's decision to exclude Dr. Roaf's testimony, we note that in addition to demonstrating an

abuse of discretion, appellant must also prove that he suffered prejudice as a result of the abuse. *See Misskelley*, 323 Ark. 449, 915 S.W.2d 702. We find no evidence that appellant suffered prejudice and affirm the trial court on this point.

*C. Testimony regarding Candace Stewart*

Appellant's final point on appeal objects to the trial court's refusal to permit him to allow proof that Dr. Garner "handed off" Mrs. Aka to Candace Stewart, an unlicensed physician, while allowing appellees to refer to her participation as "Dr." Stewart. Aka argued that he suffered prejudice regarding his lack-of-informed-consent claim because he was unable to point out that Candace Stewart was an *unlicensed* doctor and the only person made available to Mrs. Aka before she signed the consent form. According to appellant, Dr. Garner informed the nurse on duty that she would not see Mrs. Aka to provide any further information regarding the induction procedure but that Candace Stewart should see her instead. At that point, it became Stewart's obligation to obtain the patient's informed consent.

In response, appellees admitted that Stewart had not passed her medical-licensing examination, although she did obtain a doctorate in osteopathy and was a second-year resident with AHEC. In any event, appellees argued that the issue of Stewart's licensure was irrelevant per Ark. R. Evid. 401. The court agreed, reasoning that Stewart's non-licensure was not "particularly relevant because of the circumstances in which it is offered." Again, we observe that appellant must demonstrate both an abuse of the trial court's discretion and ensuing prejudice. We find no evidence of prejudice resulting from the trial court's decision to permit reference to Stewart as Dr. Stewart, and we affirm the trial court on this issue.

*IV. Cross-appeal*

On cross-appeal, appellees claim that the trial court erred by admitting Nurse Gail Parker's testimony of prior complaints about the lack of faculty supervision over the family-practice residency-training program. We will not reverse a trial court's ruling on the admission of evidence absent an abuse of that discretion, nor will we reverse absent a showing of prejudice. Misskelley, 323 Ark. 449, 915 S.W.2d 702. Here, appellees cannot demonstrate that any

prejudice occurred in view of the jury's verdict. Consequently, we affirm the trial court's decision to admit Nurse Parker's testimony.

The case is remanded to the trial court for further action consistent with this opinion.

BROWN and THORNTON, JJ., dissent in part and concur in part.

IMBER, J., concurs.

ANNABELLE CLINTON IMBER, Justice, concurring. I concur with the result reached by the majority in this matter. However, I do not agree with the analysis in Part I of the majority opinion.

The majority correctly suggests that consistency should be the benchmark when this court deals with legislative intent; however, the opinion falls short of its goal in its misplaced reliance on the amended definition of person in the homicide statutes at Ark. Code Ann. § 5-1-102 (Supp. 1999).[1] This statute provides no basis for a retroactive application of a broadened definition of personhood to the instant case.

Arkansas Code Annotated § 5-1-102 was passed as Act 1273 of 1999, three years after the events preceding the death of Baby Boy Aka. Legislative enactments are typically deemed to be prospective in application barring an express statement of a retroactive effect. *Arkansas Rural Medical Practice Student Loan & Scholarship Bd. v. Luter*, 292 Ark. 259, 729 S.W.2d 402 (1987). Act 1273 contained no such provision enabling retroactive application. Ark. Code Ann. § 5-1-102 (Supp. 1999).

The majority opinion cites *Bean v. Office of Child Support Enfcm't*, 340 Ark. 286, 9 S.W.3d 520 (2000), for the proposition that the strict rule of construction against retroactive operation of a statute does not necessarily control in the case of a remedial statute, providing that the law does not interfere with vested rights or "create new obligations." *Id.* at 297.

---

[1] For the purposes of the homicide statutes, Ark. Code Ann. §§ 5-10-101 - 5-10-105, the definition of "person" includes "*an unborn child in utero at any stage of development*" and "*an 'unborn child' means a living fetus of twelve (12) weeks or greater gestation.*" Ark. Code Ann. § 5-10-102(13)(B)(i). This definition does little to support the majority's decision that the legislature intended personhood to begin at viability.

Without getting into a discussion of whether creating liability for the wrongful death of a fetus, particularly in the medical negligence arena, creates "new obligations", I must observe that the source of legislative intent primarily relied upon by the majority in reversing our holding in *Chatelain v. Kelly*, 322 Ark. 517, 910 S.W.2d 215 (1995), derives not from a remedial source, but rather from the criminal code. The majority, in effect, bootstraps the legislative intent in the definition of "person" for the purposes of the homicide statutes to the definition of "person" in the wrongful death statute. Act 1273, as part of the criminal code, is not constitutionally susceptible to retroactive application under Article 2, section 17 of the Arkansas Constitution, or Article 1, section 10 of the United States Constitution. While I agree that this statute has some very limited relevance to our discussion of legislative intent in the wrongful death context, it simply provides no basis for a retroactive application in this case. Act 1273 of 1999 was not remedial legislation.

The majority opinion cites, but does not rely upon, a more compelling source of State policy for reversing our holding in Chatelain, and for applying our holding in this case retroactively. Amendment 68 to the Arkansas Constitution expresses the public policy of the State of Arkansas to protect the life of every unborn child from conception until birth, to the extent permitted by the Federal Constitution. Ark. Const. Amend. 68, § 2.

Amendment 68 was approved by the electorate in 1988 and was subsequently declared unconstitutional and unenforceable by the federal courts in *Little Rock Family Planning Servs. v. Dalton*, 860 F. Supp. 609 (E.D. Ark. 1994), *aff'd*, *Little Rock Family Planning Servs. v. Dalton*, 60 F.3d 497 (8th Cir. 1995).[2] *Chatelain* was decided shortly after the United States Court of Appeals for the Eighth Circuit affirmed the district court's order enjoining enforcement of Amendment 68. *See Little Rock Family Planning Servs. v. Dalton, supra*. Ultimately, the Eighth Circuit and U.S. District Court decisions were, in relevant part, reversed by the United States Supreme Court. *See Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 116 S. Ct. 1063 (1996)(holding that Amendment 68 § 1 violated the Constitution but that the remainder of the Amendment was valid to the extent it did not violate federal law).

---

[2] The district court permanently enjoined the enforcement of Amendment 68 in "its entirety," and on July 27, 1994, entered an additional order stating, "Amendment 68 to the Arkansas Constitution directly conflicts with federal law (the 1994 Hyde Amendment) and is, therefore, null, void, and of no effect."

Just as the majority does in this case, the *Chatelain*court made passing reference to Amendment 68 before concluding that "[t]he General Assembly is particularly suited to making this policy decision," *Chatelain*, 322 at 525, 910 S.W.2d at 219. The court then expressed its reluctance "to create an inconsistency in the laws of this State by holding person includes viable fetus for the purposes of the wrongful death statute when we have reached the contrary conclusion in the criminal law and the law of probate." *Id.*

The decision in *Chatelain* might very well have been different had Amendment 68 been enforceable and operative as a constitutional expression of State policy at the time. This court recognized in *Unborn Child Amend. Comm. v. Ward,* 318 Ark. 165, 883 S.W.2d 817 (1994), that, "until such time as the federal court's decision is reversed by the appropriate appellate court, the permanent injunction issued by the federal district court will be binding upon the State of Arkansas and its instrumentalities.... " *Id.* at 167, 883 S.W.2d at 818. In any event, for the purposes of our decision today, as well as the retroactive application of our holding, it is irrelevant that Amendment 68 had been declared unconstitutional and unenforceable by the federal courts at the time of the *Chatelain* decision. The United States Supreme Court decision in *Dalton, supra,* effectively erased the earlier decisions in the lower federal courts.

> The view has been taken that if the decision that a statute is unconstitutional is subsequently reversed or overruled, the statute will ordinarily be treated as valid and effective from the date of its enactment, or from its first effective date, and does not require reenactment by the legislature in order to restore its operative force

See 16 C.J.S. Constitutional Law §' 108. In *Rivers v. Roadway Express, Inc.,* 511 U.S. 298 (1994), the United States Supreme Court said, " 'when this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule' " (quoting *Harper v. Virginia Dept. of Taxation,* 509 U.S. 86, 97 (1993)); *see also, Wilkerson v. Rahrer,* 140 U.S. 545, 11 S. Ct. 865 (1891); *State ex rel. Badgett v. Lee,* 156 Fla. 291, 22 So.2d 804 (1935).

Constitutional amendments are to be construed liberally to accomplish their purpose. Porter v. McCuen, 310 Ark. 674, 839 S.W.2d 521 (1992); thus, in this case, the purpose of Amendment 68 to protect fetal life up to the extent permitted by federal law

operates to give effect to a definition of person that includes at least a viable fetus.[3] This effect of Amendment 68 has been in operation since its adoption by the voters, *Drennen v. Bennet*, 230 Ark. 330, 322 S.W.2d 585 (1959), well before the claims implicated by this case, and serves as a valid means of applying the State's policy in a retroactive manner as to these parties.

ROBERT L. BROWN, Justice, dissenting in part; concurring in part. I agree with the majority that the public policy of this state has changed so that viable fetuses are now considered persons for purposes of the wrongful-death statute. My disagreement with the majority is over when the change in public policy occurred and whether today's decision should be applied retroactively to cover only one case. I believe the public policy shift occurred in 2001 with the passage of Act 1265, which amends the wrongful-death statute so that it now applies to a person "or viable fetus." The majority agrees that today's decision should apply only to future cases, but then it carves out the Aka fetus as a sole exception. I cannot agree with that part of the opinion. I concur, however, in reversing the judgment respecting Mrs. Aka's death and sending that matter back for a new trial.

In 1995, in the case of *Chatelain v. Kelley*, 322 Ark. 517, 910 S.W.2d 215 (1995), this court held that a "person" under the wrongful-death statute only included those who had been born. We specifically said in *Chatelain* that neither our criminal law nor probate code had included viable fetuses as persons. We further said that Amendment 68, which protects "the life of every unborn child from conception until birth, to the extent permitted by the Federal Constitution" did not require us to consider fetuses as persons from the moment of conception for wrongful-death purposes.

Today, the majority overrules *Chatelain*, which I agree with, but then applies its decision retroactively to one lone case — the Aka case. In all other situations, today's decision will only apply prospectively, that is, to future cases. That aspect of today's decision has far reaching consequences. First, it undermines precedent and the stability of our common law. What the majority has done with

---

[3] *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) (upholding *Roe v. Wade*, 410 U.S. 113 (1973), in three parts: (1) "recognition of a woman's right to have an abortion before viability and to obtain it without undue interference from the state"; (2) "a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health"; and (3) "the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child").

this decision is to overrule the *Chatelain* decision after only *six days* of effectiveness. The *Chatelain* opinion was handed down on November 20, 1995. With the seventeen-day period for rehearing, that meant *Chatelain* became final on December 7, 1995, and the mandate issued. The unborn fetus in the Aka case was stillborn on December 13, 1995, which was six days later. The *Chatelain* case must hold the record in the history of jurisprudence as the case with the shortest life span. Then, there is the inherent unfairness of treating two cases with comparable facts completely differently within a six-day time frame. The result of all this is that legal stability is thrown out the window, and we are relegated to deciding fact situations on a case-by-case basis without any adherence to precedent. That flies in the face of the whole notion of the common law and *stare decisis.*

The majority's rationale for carving out the Aka case as the one exception is decidedly murky. In one place, the opinion reads: "Now, to be consistent with the current expression of legislative intent, we must depart from *Chatelain.*" The opinion footnotes Act 1265 of 2001 in support of this statement. Another part of the opinion cites Amendment 68 and states: "By federal constitutional interpretation, the state's interest in protecting the life of a fetus begins at viability." The majority cites *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992) and *Roe v. Wade*, 410 U.S. 113 (1973) for this proposition. In still another part of the decision, the majority states that the General Assembly passed Act 1273 of 1999 in response to *Chatelain* and that Act expands the definition of a "person" for homicide purposes to include "a living fetus of twelve (12) weeks or greater gestation."

Again, the burning question is when did the state's public policy on this issue change? The majority, however, presents us with four different events justifying a change in public policy, with each event occurring in a different year:

1. Amendment 68, which was passed in 1988 and protects fetuses from conception.
2. Amendment 68, as interpreted by *Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474 (1996), which held that Amendment 68 is displaced only to the extent it conflicts with federal law.
3. Act 1273 of 1999 which included fetuses of twelve weeks or greater gestation as persons for homicide purposes.
4. Act 1265 of 2001, which adds viable fetuses as persons for wrongful-death actions.

The majority's handling of this critically important social, cultural, and moral issue is muddled. For example, according to the majority, *Roe v. Wade* has effectively limited the application of Amendment 68 to viable fetuses. But then the majority also relies on Act 1273 of 1999 which extends the protection for homicide cases to fetuses of twelve weeks gestation, which is before viability. Also, if the state's public policy on viable fetuses changed as early as 1988 or 1996 or 1999, as the majority apparently believes, why does the majority apply today's decision only to future cases with the sole exception of the Aka case? The majority's reasoning is inconsistent and extremely hard to justify. A decision of this magnitude requires clarity and direction and not a patchwork quilt woven from disparate statutes, constitutional provisions, and Supreme Court decisions.

In sum, while I agree that it is appropriate to overturn *Chatelain*, I cannot condone applying today's decision retroactively to cover only one fetus case. None of the cases cited by the majority permits the overruling of a case earlier than the date that the legislative act that changed the State's public policy became effective. Here, the wrongful-death statute was not changed until Act 1265 of 2001. The majority points to *Parish v. Pitts*, 244 Ark. 1239, 429 S.W.2d 45 (1968), but that case did not turn on a change in the General Assembly's statement of public policy. Rather, in *Parish*, we concluded that the previous caselaw where we granted municipalities immunity from tort liability for the negligence of their employees was patently unjust. We overturned our previous caselaw. Moreover, in *Parish*, the General Assembly had refrained from changing the law, whereas in the case before us, the General Assembly has acted, and that is the public policy shift that the majority opinion relies on.

In the dramshop cases, this court overturned prior caselaw based on the fact that the General Assembly had altered the public policy of this state. *See Jackson v. Cadillac Cowboy, Inc.*, 337 Ark. 24, 986 S.W.2d 410 (1999) (General Assembly has established high duty of care for holders of alcohol licenses not to sell to intoxicated persons); *Shannon v. Wilson*, 329 Ark. 143, 947 S.W.2d 349 (1997) (General Assembly has determined it is the public policy of the state to protect minors from adverse consequences of alcohol consumption by making it a felony to sell alcohol to minors for monetary gain). But we did not overturn our caselaw for any case that occurred before the General Assembly altered the public policy of the state.

Nevertheless, the majority seeks to "reward" the plaintiff for causing *Chatelain* to be overruled. Again, this makes no sense when it is the General Assembly that changed the public policy of this state in response to *Chatelain* beginning with Act 1273 of 1999 and concluding with Act 1265 of 2001. The Aka lawsuit did not do so.

I would apply today's decision only from the date the General Assembly amended the wrongful death statute to include viable fetuses. That legislation (Act 1265) was approved on April 4, 2001, without an Emergency Clause and becomes effective ninety days after the General Assembly adjourned. To overturn *Chatelain* for one case for a period before the public policy of this state changed is a unique decision. There is no case where this court has previously done so. Certainly, the majority opinion cites us to none.

On a separate point, I disagree with the majority's rationale for affirming the trial court on the appellees' cross-appeal regarding the lack of faculty supervision for the residency program. The appellees' cross-appeal is conditional upon this court's reversing and remanding for a new trial. The fact that the appellees prevailed in the first trial and, thus, suffered no prejudice is not a sufficient reason to affirm. I would affirm the trial court on this point because the trial court gave a sufficient limiting instruction to the jury concerning Nurse Parker's testimony. For that reason, I conclude that the trial court did not abuse its discretion with respect to the cross-appeal.

Dissenting in part. Concurring in part.

THORNTON, J., joins.