2011 Ark. App. 257

**Kenneth KING, Appellant**

v.

**A.O. FRENCH and John Edd Curry, As Trustees of the Tyro Cemetery, and Keith Griffin d/b/a Griffin Funeral Service, Appellees.**

No. CA 10–736.

Court of Appeals of Arkansas.

April 6, 2011.

Rehearing Denied May 11, 2011.

Paul Weldon Keith, Monticello, for appellant.

Robert Victor Harper, Star City, Roy Gene Sanders, Doralee Chandler, William R. Sanders, Little Rock, for appellees.

JOHN B. ROBBINS, Judge.

This appeal concerns the right to use burial plots in the Tyro Cemetery located in Lincoln County, Arkansas. Here, the dispute concerns burial spaces lying between the King and Key family plots. King sought to have a Key family member disinterred and the adjoining grave site declared to be solely for King family use. King did not prevail, and on appeal, he argues (1) that the trial court erred in dismissing Griffin Funeral Service from his lawsuit; and (2) that the trial court's finding, that King's claim to two particular grave spaces was barred by the doctrine of laches, was clearly against the preponderance of the evidence. We affirm.

Appellant Kenneth King initially filed suit in August 2007 claiming that the neighboring burial-right owners, the Key family, had wrongfully buried three family members inside the King plot and en-

croached on one more burial space. King sued the trustees of the cemetery association (A.O. French and John Edd Curry)[1] and Keith Griffin doing business as Griffin Funeral Service. King contended that he complained to the trustees after the 1987 and 2002 burials and prior to the 2006 burial. King claimed that he also complained directly to Griffin Funeral Service in the days prior to the 2006 burial of George Myers. King sought equitable relief due to the deprivation of the use of the plots, an order to disinter George's remains, and an injunction to prevent further encroachment in the burial space next to George.

Griffin answered the complaint, asserting (1) that his employees acted solely at the direction of the cemetery association in excavating and closing the plot for the March 2006 burial such that dismissal was warranted, and (2) that King had failed to join the next of kin of the buried person as necessary parties. The association answered with a general denial of the allegations and added the defense of laches. King amended his complaint to name Paul Key (Key family representative) and Rebecca Myers (member of Key family and widow of George Myers) as additional defendants. Paul and Rebecca filed general denials of the allegations. In April 2009, the trial judge entered an order dismissing with prejudice King's complaint against Griffin on the basis of Ark. R. Civ. P. 12(b)(6). King sought to appeal that dismissal but later withdrew his notice of appeal regarding that order.

In January 2010, the case was tried to the bench. The evidence was largely undisputed. The cemetery land is owned by the cemetery association, donated to it by the King family some years ago. Families desiring to purchase a license or right to certain areas for burial would pay $250

to the association, which covered basic maintenance. Generally, the designated family plots were 24' × 24', but there were variances due to obstructions like trees or driveways. The family plots typically hold up to twelve burial spaces. Between 1977 and 1980, the Key and King family plot licenses were purchased. The Key plot (# 125) is directly north of the King plot (# 126). Both family plots face east along a driveway, which would be considered the frontage of each plot. As drawn, each plot would appear to accommodate more grave sites along the front, so the meeting point between the family plots would be two grave sites "long" along the depth of the family plots.

The first body interred between the two family plots was of Bessie King, who died in 1980. Someone placed corner stones to mark the corners between the family plots. Bessie was placed well inside the King plot to its southern end. Next to pass away was John King, who was buried next to Bessie in the far southern end.

The first of the Key family to pass away and be buried in this cemetery was Eloise Key, who died in 1987 and was buried on the far southwest corner of the Key plot, which King believed to encroach onto his family's northwest corner. King complained to the association that her grave and the adjoining headstone for her husband N.B. was on the King plot. King said that this was when he noticed the King family plot corner markers had been moved to the south and farther onto the King family plot.

N.B. died in 2002 and was buried to the south of Eloise, further encroaching upon the King family plot. These two burial places were along the backside of the family plots, near the barbed-wire fencing to

---

1. John Edd Curry is deceased.

the west. King complained again, and cemetery personnel measured the boundary markers, deciding that the placement was correct as it was. King hired an attorney at that time due to his concerns but nothing came of it.

In March 2006, George Myers died. King became aware that George (married to a member of the Key family) was to be buried in the far southeast of the Key plot in line with N.B., which would complete the east-west line between the family plots. King saw this as essentially taking four plots (Eloise and N.B. in back, George and later his wife in front) that belonged to his family. King complained to the association, which re-measured and decided the boundaries were correct, and he also complained to the grave diggers who worked for Griffin prior to the burial.

King was not seeking to move Eloise and N.B., but he believed that George should be moved because he warned not to bury him there. He also objected to the dual headstone placed for George because it created an intended space next to him for his wife, which would take another of his family's spaces (in line with Eloise's grave and along the front of their plots).

King paid a surveyor to prepare a drawing of existing markers and graves. The surveyor found that the Key family plot was approximately 21.3' wide whereas the King family plot was 18.4' wide. This meant that both families were "shorted" a few feet in width across the front. But each family plot was a bit more than 24' in depth.

Carol Leonard, the current cemetery caretaker, also testified about the size and square footage of the Key and King family plots, noting that although there was a shortage in frontage for both families, there was extra room in the area between the back of the plots and the barbed-wire fence to the west that could be utilized. Ray Leonard, Carol's brother-in-law, was asked by Carol to re-measure the plots to ensure they were correct. Ray testified to his belief that the southern corners of the Key plot were correct.

Paul Key testified that he was at the grave site when the plot for George was to be dug in 2006. Paul said King was also present but made no complaint to him except to request that they not get dirt on his wife's grave, directly to the south of the plot where George was to be placed.

In March 2010, the trial judge entered an order dismissing King's complaint. The judge found that (1) the King family staked out their plot first giving King a precedential interest in the grave sites; (2) due to the movement of the corner markers between the Key and King plots, which King noticed in 1987, the King plot was diminished by a width of two grave sites; (3) King abandoned his lawful claim by sitting on his rights after the 1987 and 2002 burials and not filing suit; and (4) the request to disinter George would be denied. King filed a timely notice of appeal from the March 2010 order.[2]

First, King asserts that the trial court erroneously dismissed Griffin Funeral Services from this lawsuit. Griffin contends that King's notice of appeal is ineffective to

---

**2.** Prior to the bench trial in January 2010, Paul and Rebecca inexplicably disappear from the caption of any motions and orders. Paul appears as a witness at the bench trial but is not recognized as a party. Victor Harper represented both the cemetery association and Paul and Rebecca as they were added to the case. Harper purportedly represents all their interests on appeal too, according to their appellees' brief. Because the final order on appeal dismissed appellant's complaint in its entirety, this moots any potential finality issue.

appeal the earlier dismissal, but we disagree. King is correct when he states that until the entire case was disposed of, there was no final order to appeal. Ark. R.App. P.-Civ. 2(a)(11) (2010); Ark. R. Civ. P. 54(b). An appeal from a final order also brings up for review any intermediate order involving the merits and necessarily affecting the judgment. Ark. R.App. P.-Civ. 2(b) and 3(a). Here, King specifically appealed "the decision entered herein on March 19, 2010[.]" This was the final judgment after the bench trial, long after Griffin was dismissed from the case in April 2009. This is similar to the situation in *Aka v. Jefferson Hospital Association*, 344 Ark. 627, 42 S.W.3d 508 (2001), where our supreme court rejected the argument that appeal of a final judgment, specifically enumerated in the notice of appeal, was not sufficient to permit review of an earlier order of partial summary judgment dismissing two defendants from that lawsuit, where the earlier order was not specifically enumerated in the notice of appeal. The supreme court determined that a non-final preliminary order was just such an "intermediate order" contemplated by Ark. R.App. P.-Civ. 2(b), and that not naming it in the notice of appeal was not a procedural, jurisdictional defect. *Id.* at 638, 42 S.W.3d at 515.

On the merits of this point, we disagree with King that the trial court erred in dismissing Griffin from the lawsuit.

We are convinced that, while titled a dismissal under Ark. R. Civ. P. 12(b)(6), this was in actuality a summary judgment. In deciding a motion to dismiss under Rule 12(b)(6), the trial court is limited to consideration of the pleadings. *Bayird v. Floyd*, 2009 Ark. 254, 308 S.W.3d 142. In arguing to the trial court, Griffin attached excerpts from the cemetery caretaker's deposition and King's deposition to demonstrate that Griffin's employees acted only at the direction of the cemetery personnel and that King did not attribute any wrongdoing to the funeral service's digging and covering of the grave. Griffin asked that the motion to dismiss be alternatively treated as a motion for summary judgment. The trial court allowed King time to respond to Griffin's motion. King asked that the trial court strike the extraneous materials in consideration of the motion to dismiss, but no ruling was ever obtained. When a trial court is presented with extraneous materials outside the pleadings and does not exclude those materials, a motion to dismiss under Rule 12(b)(6) "shall be treated as one for summary judgment." *Nielsen v. Berger–Nielsen*, 347 Ark. 996, 69 S.W.3d 414 (2002).

When considering a summary judgment on appeal, we view the evidence and all inferences in the light most favorable to the nonmovant. *Id.* The issue is whether any material question of fact remains; its purpose is not to try the issues but to determine whether there are any issues to be tried. *Id.* We hold that the trial court did not err in granting summary judgment and dismissing Griffin from the lawsuit because, even though Griffin dug and covered this grave, it owed no duty and thus breached none to King. The caretaker's deposition testimony demonstrated that she was the final authority on where the grave was to be dug, and she believed Griffin did nothing wrong. King's deposition reflected the same position: "I don't think they [Griffin Funeral Service] should have done anything different. It wasn't their problem." There remained no issue of material fact to be decided as to Griffin, and thus summary judgment was appropriate.

The second basis on which King seeks reversal is his allegation that the trial court clearly erred in finding that

laches and estoppel prevented him from asking that George be moved and that any encroachment on the adjoining burial plot be enjoined. In reviewing the findings after a bench trial, we reverse if the findings are clearly erroneous or clearly against the preponderance of the evidence. *White v. McGowen,* 364 Ark. 520, 222 S.W.3d 187 (2006). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that a mistake was committed. *Id.* Disputed facts and credibility determinations are within the province of the factfinder, here the trial judge. *Id.*

 The doctrine of laches is an equitable principle premised on some detrimental change in position made in reliance upon the action or inaction of another party. *Goforth v. Smith,* 338 Ark. 65, 991 S.W.2d 579 (1999). It is based upon the assumption that the party to whom laches is imputed has knowledge of his rights and the opportunity to assert them, that by reason of his delay some adverse party has good reason to believe those rights are worthless or have been abandoned, and that because of a change of condition during this delay it would be unjust to the latter party to allow the knowing party to assert those rights. *Id.* Stated another way, laches is ordinarily applied to situations in which the complainant stood idly by while the other party has materially changed his position. *Richards v. Ferguson,* 252 Ark. 484, 479 S.W.2d 852 (1972).

██ The custom of setting aside individual places for burial may be traced to ancient times, which is a commentary on the special protection that society has deemed appropriate for final resting places. *Rial v. Boykin,* 95 Ark.App. 404, 237 S.W.3d 489 (2006). The special consideration given to burial plots requires that in some respects they not be treated as

subject to the laws of ordinary property. *Id.* It is generally recognized that the rights regarding cemetery plots are contractual and that the interest acquired by the owner is considered a privilege, easement, or license. *Id.* Arkansas has recognized these as vested easement rights, which survive until the plot is abandoned by the person who established the plot or his heirs or by the removal of buried bodies. *Id.*

This cemetery followed the practice of licensing plot areas by payment of a fee and by allowing placement of markers at the corners. The trial court recognized this and found that the King plot, set by markers first, was diminished by the movement of the corner markers along the abutting boundary toward the south, losing a width of two burial spaces. King knew about this in 1987. We believe that laches undoubtedly applies to the grave sites of Eloise and N.B. due to the passage of time without more affirmative action than generalized complaints. Even King agrees that he has no legitimately lawful basis to move those remains.

██ The more troubling question is whether that same principle applies to the front two burial spaces, occupied by George and reserved to the northern side for his wife. We believe that the trial court correctly found that King failed to act on his rights in a timely manner as to these two burial sites. The entire east-west line between the family plots was changed by the moved markers somewhere around 1987. This would include the "front" marker near George. The doctrine of laches depends upon the circumstances of each case and is a question of fact. *Cochran v. Bentley,* 369 Ark. 159, 251 S.W.3d 253 (2003). We agree with the trial court that due to this nearly twenty-year delay in filing suit, King is barred by the doctrine of laches to now attempt to

carve out two grave sites along an established family grave-site boundary, which already holds the remains of a member of the Key family. *See Summit Mall Co. v. Lemond,* 355 Ark. 190, 132 S.W.3d 725 (2003); *Goforth v. Smith,* 338 Ark. 65, 991 S.W.2d 579 (1999).

For the foregoing reasons, we affirm the trial court's order dismissing King's complaint after trial against the cemetery trustees.

Affirmed.

VAUGHT, C.J., and HOOFMAN, J., agree.