Gary BEAN *v.* OFFICE of
CHILD SUPPORT ENFORCEMENT

99-131                                          9 S.W.3d 520

Supreme Court of Arkansas
Opinion delivered February 3, 2000

LAVENSKI R. SMITH, Justice. Appellant Gary Bean appeals a Nevada County Chancery Court decision which found Bean to be the father of M.N. Bean contends that the trial court erred because another man had acknowledged paternity two days after the child was born some six years prior to this action. The Arkansas Court of Appeals certified this matter to us as a case presenting an issue of significant public interest and involving a legal principle of major importance. We, therefore, have jurisdiction under Ark. Sup. Ct. R. 1-2(d)(2) and 1-2(b)(4), (5) and (6).

*Facts*

Donna Kay Hale, M.N.'s mother, married Jeffery Bryant Smith on November 21, 1988, in San Jose, California. Hale soon separated from Smith because of alleged abuse in the marriage. Hale moved from California to Arkansas in June 1989 after which she began working at Delta Express in Russellville, Arkansas. Within a week of starting her new job, Hale met Bean at work, and the two began dating sometime in early July 1989. According to Hale, their relationship became intimate within a week of their initial meeting, and the couple were sexually involved until mid-November 1989. Bean, however, testified at trial that he met Hale in 1988, and last saw her in June 1989. Hale found out she was pregnant in December 1989, and she apparently called Bean at his place of work to

inform him of the news. According to Hale, Bean did not want to have anything to do with the child.

While pregnant with Bean's child, Hale met Stanley Ross Nichols. Hale testified that the two became friends in January 1990 but admitted on cross-examination that they actually met in November 1989. Within two months, Hale moved in with Nichols. Hale and Nichols became sexually intimate. On May 3, 1990, Hale secured a divorce from Smith. Two days after M.N.'s birth, on June 28, 1990, Hale and Nichols executed an "Affidavit of Birth Out of Wedlock" stating that they were M.N.'s natural parents. In particular, the Department of Health form provided that the child would bear Nichols's surname and that Nichols was "acknowledging possible financial and legal responsibilities to the child herein." Nichols agreed to assume the obligations of being M.N.'s father. Nichols's name appears on the birth certificate as M.N.'s father.

According to Hale, she and Nichols continued to cohabit until late July 1990 when Hale went to a rodeo with Bean causing Nichols to end the relationship with Hale. Soon thereafter, Hale moved to Gloucester, New Jersey. There, she filed a paternity action against Nichols in December 1990. In April 1991, Hale married David Dibartolo in New Jersey. The couple divorced in October 1995. During this time, Hale indicated at trial that she contacted Bean about twice between 1993 and 1995. Bean acknowledged that he first learned about M.N. in 1993 when Hale called him.

Hale subsequently returned to Arkansas and filed for and received Medicaid benefits for M.N. Appellee, Arkansas Child Support Enforcement Unit ("CSEU"), brought a paternity action against Bean based upon Hale's allegations on April 22, 1996, alleging paternity and seeking past child support for M.N.'s birth, lying-in expenses from the birth, health insurance, future child support, and attorney's fees and costs. Bean answered this complaint on May 29, 1996, denying that he was M.N.'s father and moving to dismiss the action against him. In an order entered October 8, 1996, the chancery court denied Bean's motion to dismiss and ordered DNA testing of Hale, M.N., and Bean pursuant to Ark. Code Ann. § 9-10-108 (Repl. 1995).

On December 23, 1996, Bean filed a motion for summary judgment arguing that Nichols is M.N.'s father by operation of law because Nichols signed the Affidavit of Birth Out of Wedlock or, in the alternative, Smith, Hale's first husband, is M.N.'s presumed father. Bean argued that he was entitled to judgment as a matter of law pursuant to Ark. Code Ann. § 9-10-120 (1995). CSEU answered, and the court held a hearing on this motion on January 28, 1997. There, Bean argued that Ark. Code Ann. §§ 9-10-115 (Repl. 1995) and 9-10-120 control to require as a matter of law that Nichols be determined the father because he executed an acknowledgment to that fact, and more than five years had passed since that acknowledgment was signed. In response, CSEU argued that these statutes did not go into effect until 1995 and could not be applied retroactively. Additionally, CSEU contended that such evidence only shifted the burden to Nichols to rebut a presumption that he is M.N.'s father. CSEU then submitted evidence of a DNA test which excluded Nichols as M.N.'s father. Bean's attorney objected to the admission of the test results, arguing that the test is hearsay and that Bean would be challenging that test at the paternity hearing. The court allowed the test results to be admitted for purposes of that hearing only. The court denied Bean's motion for summary judgment.

The court held the paternity hearing on March 4, 1998. At the hearing Bean renewed his argument that Nichols's affidavit established Nichols as M.N.'s father by operation of law. CSEU, consistent with its pleadings, argued that the governing statutes could not be applied retroactively to cause such an outcome. CSEU presented witnesses including Bean, Hale, Hale's mother Mary Ray, and CSEU Investigator Phyllis Beaty, who all testified to the facts noted above. At the close of CSEU's case, Bean's attorney moved for a directed verdict arguing that two necessary parties, Smith and Nichols, were not parties in the case and that a paternity action could still be pending against Nichols in New Jersey. Furthermore, there was no evidence presented at this trial that Nichols was not M.N.'s father, and the statute of limitations to modify an acknowledgment of paternity had already run by the time Hale filed this action. CSEU replied that Smith and Nichols were not necessary parties because Hale's and Smith's divorce decree indicated that no children were born of the marriage, and Ark. Code Ann. §§ 9-10-115 and 9-10-120 cannot be applied retroactively to make Nichols

the father by operation of law. The court overruled Bean's motion for directed verdict.

Bean presented several witnesses, including Robert E. McGhee, Jr., Ph.D., who analyzed the DNA test results establishing Bean's paternity of M.N.. McGhee testified that the lab's test results only indicated that Bean is M.N.'s father by a 926-to-one margin, which indicates that the test was "not even close to clear and convincing." Furthermore, McGhee testified that the "gel" tests were unreliable because the "gels" migrated, making them inaccurate to compare. McGhee testified that the tests could have been rerun, but they were not, which calls into question the test procedures used. On cross-examination, McGhee indicated that the State's 95% match requirement means that there is only a nineteen-to-one requirement to prove paternity.

At the close of the hearing, Bean again moved for directed verdict, which the trial court denied. However, based on McGhee's testimony at trial, the court provided Bean the opportunity to have additional DNA testing performed by McGhee at Bean's expense. Bean agreed to this testing, and the trial court entered an order on March 27, 1998, ordering additional DNA testing. The additional testing indicated that there was a 99.99% probability of paternity, as noted in the report dated May 4, 1998. With the results of the additional testing in hand combined with the testimony at the hearing, the trial court entered its order on September 21, 1998, finding Bean to be M.N.'s father. The chancery court ordered Bean to carry insurance on the child, as well as pay $85.00 a week in child support beginning with the date of the filing of the action against him. This resulted in a judgment of $10,030.00 with 10% interest thereon to be paid at a rate of $8.50 per week in addition to his regular support payments. Bean filed his Notice of Appeal on October 9, 1998.

On appeal, Bean argues that the trial court erred in determining that he is M.N.'s father because Nichols acknowledged paternity in writing two days after M.N. was born. Bean divides his argument into three parts. First, he argues that the court erred in failing to follow the statutory procedure for modification of a paternity acknowledgment. Second, he argues that the statute of limitations for modification of a paternity acknowledgment has run. Third, he argues that even if paternity was correctly established in Bean, the

chancery court erred in awarding child support from the date the complaint was filed instead of the date judgment was entered.

■ We review chancery cases *de novo* on the record, but do not reverse a finding of fact by the chancellor unless it is clearly erroneous. *Moon v. Marquez*, 338 Ark. 636, 999 S.W.2d 678 (1999); *Office of Child Support Enf. v. Eagle*, 336 Ark. 51, 983 S.W.2d 429 (1999). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Huffman v. Fisher*, 337 Ark. 58, 987 S.W.2d 269 (1999).

Bean's first two arguments center on the "Affidavit of Birth Out of Wedlock," which Nichols signed two days after M.N. was born, and the birth certificate, which lists Nichols as M.N.'s father. Bean offered these as conclusive evidence that Nichols is M.N.'s father by operation of law under Ark. Code Ann. § 9-10-120. As he did below, Bean argues that Nichols's signature and name on these documents, as well as the fact that more than five years have passed since these documents were executed, precludes the court from considering the matter and establishing paternity in Bean. In rebuttal, CSEU argues that the affidavit Nichols signed is not an acknowledgment of paternity. Furthermore, CSEU argues that the law which establishes paternity by operation of law upon signing an acknowledgment of paternity was not in effect at the time that Nichols signed the affidavit; therefore, the statute on which Bean relies, which went into effect in 1995, does not retroactively establish Nichols as M.N.'s father by operation of law. In addition, the five-year statute of limitations cannot apply, as well, because the affidavit created no obligation on Nichols's part as M.N.'s father because no statute was in effect to create a voluntary acknowledgment of paternity to be a binding, conclusive obligation under law. We hold that A.C.A. § 9-1-120 does not apply retroactively and, therefore, affirm.

*I. The Applicable Statutes and the Form Acknowledging Paternity and 9-10-120.*

At the time of M.N.'s birth in 1990, the applicable paternity statute, Ark. Code Ann. § 9-10-115, provided:

The court may, at any time, enlarge, diminish, or vacate any such order or judgment in the proceedings under this section and §§ 9-10-101 — 9-10-103, 9-10-105, 9-10-110, 9-10-111, and 9-10-117 — 9-10-119 as justice may require and on such notice to the defendant as the court may prescribe.

Act 1091 of 1995 modified this statute substantially. This revised version, which was in effect when Hale filed this paternity action against Bean in 1996, stated[1]:

9-10-115. Modification of orders or judgments.

(a) The chancery court may, at any time, enlarge, diminish, or vacate any such order or judgment in the proceedings under this section, except in regard to the issue of paternity, as justice may require and on such notice to the defendant as the court may prescribe.

(b) The court shall not set aside, alter, or modify any final decree, order, or judgment of paternity where paternity blood testing, genetic testing, or other scientific evidence was used to determine the adjudicated father as the biological father.

(c)(1) Upon request for modification of a judicial finding of paternity or a support order issued pursuant to § 9-10-120, if the court determines that the original finding of paternity or support order did not include results of scientific paternity testing, consent of the parents, or was not entered upon a party's failure to comply with scientific paternity testing ordered by the court, the court shall, upon request when paternity is disputed, direct the biological mother, the child, and the adjudicated or presumed father to submit to scientific testing for paternity, which may include deoxyribonucleic acid testing or other tests as provided by § 9-10-108.

(2) In no event shall the adjudication or acknowledgment of paternity be modified later than five (5) years after such adjudication or execution of such acknowledgment.

(d) If the court determines, based upon the results of scientific testing, that the adjudicated or presumed father is not the biological father, the court shall, upon request of an adjudicated or presumed father, set aside a previous finding of paternity and relieve

---

[1] This statute was again amended in 1997 and 1999. These versions, however, do not apply to this case because they were not in effect when the action was filed or when Nichols signed the affidavit.

the adjudicated or presumed father of any future obligation of support or any back child support as authorized under § 9-14-234 as of the date of entry of the order of modification.

(e) If the court determines, based upon the results of scientific testing, that the presumed father is the biological father, the court shall enter an order adjudicating paternity and setting child support in accordance with § 9-10-109, the guidelines for child support, and the family support chart.

In addition, Act 1091 of 1995 created Ark. Code Ann. § 9-10-120, which stated [2]:

9-10-120. Effect of acknowledgment of paternity.

(a) A man is presumed to be the father of a child for all intents and purposes if he and the mother execute an acknowledgment of paternity of the child pursuant to § 20-18-408 or § 20-18-409, or a similar acknowledgment executed during the child's minority.

(b)(1) Acknowledgments of paternity shall by operation of law constitute a conclusive finding of paternity, subject to the modification of orders or judgments under § 9-10-115, and shall be recognized by the chancery courts and juvenile divisions thereof as creating a parent and child relationship between father and child.

(2) Such acknowledgments of paternity shall also be recognized as forming the basis for establishment and enforcement of a child support order without a further proceeding to establish paternity.

(c) Upon submission of the acknowledgment of paternity to the Division of Vital Records of the Department of Health, the State Registrar of Vital Records shall accordingly establish a new certificate of birth reflecting the name of the father as recited in the acknowledgment of paternity.

Based on the 1995 revised statutes, Bean argues that Nichols's execution of the "Affidavit of Birth Out of Wedlock" constitutes an "acknowledgment of paternity" sufficient to qualify by operation of law as a conclusive finding of paternity under Ark. Code Ann. § 9-10-120(a) and (b)(1) and, because more than five years had passed

---

[2] This statute was amended in 1997. This version, however, does not apply to this case because it was not in effect when the paternity action was filed or when Nichols signed the affidavit.

since Stanley signed the affidavit, this conclusion could not be modified by the chancery court pursuant to Ark. Code Ann. § 9-10-115(c)(2). CSEU, on the other hand, argues that not only was this affidavit not the type of form contemplated by the Act but also that Act 1091 of 1995 cannot be retroactively applied to this affidavit which was signed in 1990 to bring it under the statute and make it binding on Nichols.

We first consider whether the "Affidavit of Birth Out of Wedlock" is the type of acknowledgment of paternity contemplated by the statutes. Ark. Code Ann. § 9-10-120(a) notes that the court may consider "an acknowledgment of paternity of the child pursuant to § 20-18-408 or § 20-18-409, or a similar acknowledgment executed during the child's minority" when it makes a determination of paternity. Ark. Code Ann. §§ 20-18-408 and 20-18-409, created by Act 928 of 1993 and partially amended in 1995, established an actual form to be used as an affidavit of paternity so that parents could establish paternity. As noted at the paternity hearing, CSEU Investigator Phyllis Beaty offered a sample of a form used for such a purpose, and the form was titled "Affidavit Acknowledging Paternity."

Clearly, these statutes were not in effect in 1990 when Nichols signed the "Affidavit of Birth Out of Wedlock" to allow that acknowledgment to comply with Ark. Code Ann. § 20-18-408 or § 20-18-409. However, Ark. Code Ann. § 9-10-120(a) also allows a "similar acknowledgment" to suffice if it is executed during the child's minority. The pertinent language of that affidavit states:

> The following affidavit must be signed in the presence of a notary public by both parents of a child born out of wedlock if there is mutual consent for the child to carry the surname of the father or the legal surname of the mother, and for the birth certificate to show information on the father.

The form goes on to state:

> We, the natural parents of M.N. Ross Nichols born in Russellville, Pope County, Arkansas, on 06-26-90, wish to have our child carry the surname as indicated in the box checked below and for the birth certificate to show all requested information on the father. We understand that by signing this affidavit, the natural father is acknowledging possible financial and legal responsibilities to the child named herein.

Both Nichols's and Hale's notarized signatures appear on the form. The form notes that M.N. is to carry the surname of Nichols, and that is the surname that appears on M.N.'s birth certificate. In reading the "Affidavit of Birth Out of Wedlock" signed by Nichols, we hold that it would comply with the intent of § 9-10-120(a) as "a similar acknowledgment."

## II. Retroactive Effect of the Applicable Statutes

However, whether the "Affidavit of Birth Out of Wedlock" suffices as "a similar acknowledgment" under the statutes, does not resolve whether the statutes, enacted five years after Nichols signed this form, apply retroactively to such acknowledgment. Bean argues that the statutes do have a retroactive effect because it is a civil act that affects eligibility for welfare and is "remedial in nature." Furthermore, Bean argues that because this act affected the State's eligibility for federal aid, the act can be applied retroactively. Bean also cites *Littles v. Fleming*, 333 Ark. 476, 970 S.W.2d 259 (1998) ("*Littles II*"), for the proposition that this court has already applied Act 1091 of 1995 retroactively. To the contrary, CSEU argues that all legislation is intended to act prospectively unless the purpose and intent of the legislature is to give the statutes retroactive effect which is expressly declared or necessarily implied from the language used. In that Act 1091 contained no express retroactivity, the language of that Act could only intend a prospective application. CSEU is correct.

■ Our rule on this point could not be more clear. Retroactivity is a matter of legislative intent. Unless it expressly states otherwise, we presume the legislature intends for its laws to apply only prospectively. *Estate of Wood v. Arkansas Dep't of Human Servs.*, 319 Ark. 697, 894 S.W.2d 573 (1995) (citing *Chism v. Phelps*, 228 Ark. 936, 311 S.W.2d 297 (1958)). Any interpretation of an act must be aimed at determining whether retroactive effect is stated or implied so clearly and unequivocally as to eliminate any doubt. In determining legislative intent, we have observed a strict rule of construction against retroactive operation and indulge in the presumption that the legislature intended statutes, or amendments thereof, enacted by it, to operate prospectively only and not retroactively. *See Arkansas Rural Med. Practice Student Loan & Scholarship Bd. v. Luter*, 292 Ark. 259, 729 S.W.2d 402 (1987); *Chism, supra;*

*Arkansas State Highway Comm'n v. Hightower*, 238 Ark. 569, 383 S.W.2d 279 (1964).

■ However, this rule does not ordinarily apply to procedural or remedial legislation. *Gannett Rover States Publ'g Co. v. Arkansas Industrial Dev. Comm'n*, 303 Ark. 684, 799 S.W.2d 543 (1990); *Forrest City Mach. Works v. Aderhold*, 273 Ark. 33, 616 S.W.2d 720 (1981). The strict rule of construction does not apply to remedial statutes which do not disturb vested rights, or create new obligations, but only supply a new or more appropriate remedy to enforce an existing right or obligation. *Harrison v. Matthews*, 235 Ark. 915, 362 S.W.2d 704 (1962). Procedural legislation is more often given retroactive application. *Barnett v. Arkansas Transp. Co.*, 303 Ark. 491, 798 S.W.2d 79 (1990). The cardinal principle for construing remedial legislation is for the courts to give appropriate regard to the spirit which promoted its enactment, the mischief sought to be abolished, and the remedy proposed. *Arkansas Dep't of Human Servs. v. Walters*, 315 Ark. 204, 866 S.W.2d 823 (1993); *Skelton v. B.C. Land Co.*, 260 Ark. 122, 539 S.W.2d 411 (1976) (citing *United States v. Colorado Anthracite Co.*, 225 U.S. 219 (1912)). In addition, we have approved retroactive application of civil statutes, especially those concerning the fiscal affairs of government. For example, we held that the State can retroactively impose taxes. *DuLaney v. Continental Life Ins. Co.*, 185 Ark. 517, 47 S.W.2d 1082 (1932). The United States Supreme Court has also said taxes can be retroactively applied. *Reinecke v. Smith*, 289 U.S. 172 (1933).

As noted above, Bean argues that not only does Act 1091 of 1995 affect the fiscal affairs of the State but that it is remedial in nature. Bean notes that Act 1091 was enacted to "conform with federal requirements set forth in title IV-D of the Social Security Act relative to voluntary paternity acknowledgments." The relevant portion of Title IV-D of the Social Security Act, codified at 42 U.S.C.S. §§ 651—676, includes § 668 entitled "Encouragement of States to adopt simple civil process for voluntarily acknowledging paternity and a civil procedure for establishing paternity in contested cases." This section states:

> In the administration of the child support enforcement program under this part, each State is encouraged to establish and implement a simple civil process for voluntarily acknowledging paternity and a civil procedure for establishing paternity in contested cases.

This section was enacted in 1988 and amended in 1996. As the language indicates, there is nothing in this particular section which required immediate adoption of a specific procedure, but instead "encouraged" the establishment of a procedure of voluntary acknowledgment. In fact, the 1996 amendment of § 668 struck "a simple civil process for voluntarily acknowledging paternity" as part of that statutory section. Compliance with the federal statutes is required in order for the states to continue to receive certain federal benefits[3]; however, § 668 does not appear to be mandatory as far as voluntary acknowledgments are concerned, but instead actually focuses on the establishment of a civil procedure for establishing paternity.

Using that history, determining whether the legislature intended Act 1091 of 1995 to be retroactive becomes clearer. As noted, in the absence of an express declaration, in order for a statute to be applied retroactively, it either must affect the fiscal viability of the State or qualify as remedial. To be remedial, the courts must "give appropriate regard to the spirit which promoted its enactment, the mischief sought to be abolished, and the remedy proposed," but cannot "disturb vested rights, or create new obligations, but only supply a new or more appropriate remedy to enforce an existing right or obligation." *Harrison, supra.*

■ Whether the State would be fiscally harmed by failure to include the "voluntary acknowledgment of paternity" language was a prospective concern, as there is no indication that funds had been cut off or were likely to be. The federal statute did not require, but only "encouraged," compliance with the provision and, in fact, such language was removed from § 668 a year after the passage of Act 1091. Bean notes that the Emergency Clause of Act 1091 stated that there was a problem with the voluntary acknowledgment of paternity, and failure to remedy that provision could affect the State's right to federal benefits. Bean fails to note, however, that the Emergency Clause also states that "an emergency is hereby declared to exist and this act being necessary for the immediate preservation of the public peace, health and safety *shall be in full force and effect from and after its passage and approval.*" (Emphasis added.) This is not a definite statement that the Act will apply retroactively. Finally,

---

[3] 42 U.S.C.S. §§ 651-676.

retroactive application of Act 1091 for remedial purposes would only be appropriate if it did "not disturb vested rights, or create new obligations, but only supply a new or more appropriate remedy to enforce an existing right or obligation." If Act 1091 were applied to any type of "acknowledgment" signed before the Act's effective date a new obligation would be created. The man signing the form, *by operation of law* (see Ark. Code Ann. § 9-10-120), would become the father conclusively when, before Act 1091 was passed, such evidence could only be used as persuasive, presumptive evidence of paternity.

Bean also argues that we have already applied Act 1091 retroactively in *Littles v. Flemings*, 333 Ark. 476, 970 S.W.2d 259 (1998)("*Flemings II*"). We disagree with Bean's analysis of *Flemings*. It simply is inapposite to the instant facts. In that case, the issue was whether "one, who has been adjudicated to be the father of a child is entitled to relief from future child-support obligations if scientific testing proves that he is not the child's biological father." There, Littles was adjudicated to be the father of a child in 1982 when he failed to pay for the DNA testing to establish paternity. He did not appeal from the judgment. In 1994, Littles moved the chancellor to order a paternity test, and that motion was granted. The test proved that he was not the biological father, and Littles moved the chancery court in July 1995 to set aside the 1982 paternity judgment, which the court did. We reversed the chancellor's decision in *Flemings v. Littles*, 325 Ark. 367, 926 S.W.2d 445 (1996) ("*Flemings I*"). In the reversal decision, we held that the chancellor had no authority under Ark. Code Ann. § 9-10-115(c)(1) to modify the original judicial finding of paternity because Littles had not met all statutory conditions for the granting of relief. However, in *Flemings II*, after Littles returned to the chancery court to have the child-support order *modified* pursuant to changed circumstances, we allowed a modification of future support pursuant to Ark. Code Ann.§ 9-10-115(d) after a showing of scientific evidence that the adjudicated father was not the natural father. The *Flemings* cases involved substantially different facts and none of the same issues as the present case. Moreover, the *Flemings* cases contain no holding respecting retroactive application of Act 1091 for any purpose.

■ Because we hold that Ark. Code Ann. § 9-10-115 should not be applied retroactively, Bean's second argument therefore also fails. The five-year statute of limitations found in the then existing

version of § 9-10-115(c)(2) cannot apply to the Nichols affidavit. If the voluntary acknowledgment of paternity is not conclusive by operation of law under the law as it existed in 1990, which it is not, then paternity has not been established in Nichols to trigger the running of the statute of limitations.

### III. Award of Child Support

In his final point on appeal, Bean argues that if this court determines that the chancellor did not err in finding that he is M.N.'s father, the chancellor did err in awarding child support from the date of the filing of the complaint. Again, Bean argues this point using Ark. Code Ann. § 9-10-115(d) which provides, in part, that:

> If the court determines, based upon the results of scientific testing, that the adjudicated or presumed father is not the biological father, the court shall, upon request of an adjudicated or presumed father, set aside a previous finding of paternity and relieve the adjudicated or presumed father of any future obligation of support or any back child support as authorized under § 9-14-234 as of the date of the entry of the judgment.

Bean argues first that the chancery court erred in failing to set aside the acknowledgment of paternity signed by Nichols and, therefore, there was no statutory compliance because Nichols did not request to have that acknowledgment set aside. Second, Bean argues that the 1995 version of this statute (above) states that the change in child-support responsibility will not go into effect until the entry of the order by the chancellor setting aside the original acknowledgment of paternity.

Bean relies upon the modification provisions of Ark. Code Ann. § 9-10-115. However, those provisions are not relevant to Bean's child-support obligation because the action filed against him is an original action rather than a modification. Given the possibility of an award from the date of the child's birth, the chancellor's decision to award support from the date of the complaint was not clearly erroneous. In response, CSEU argues that because paternity was never established in Nichols, either by adjudication or by his signing the Affidavit of Birth Out of Wedlock (since Act 1091 of 1995 cannot be applied retroactively), there has never been a finding of paternity for the court to set aside under Ark. Code Ann. §

9-10-115. Therefore, Ark. Code Ann. § 9-10-111 (Supp. 1995), which allows the chancery court to award support from as early as the date of the birth of the child, applies. The statute states:

> (a) If it is found by the chancery court that the accused is the father of the child and, if claimed by the mother, the chancery court or chancellor shall give judgment for a monthly sum of not less than ten dollars ($10.00) per month for every month from the birth of the child until the child attains the age of eighteen (18) years.

Here, the trial court had the option to award past support from M.N.'s birth forward, but chose instead to award past support from the date of the filing of the complaint against Bean to the time the judgment was entered. This decision was made contrary to both parties' requests, as Bean, of course, argued that support should begin with the entry of the judgment, and CSEU argued that support should begin from M.N.'s date of birth forward. Because the chancellor could have awarded support from M.N.'s date of birth, his decision to award support from the date of the filing of the complaint was not clearly erroneous.

■ In conclusion, because CSEU's claim against Bean is actually an original action to establish paternity, as opposed to an action to modify a paternity order under Ark. Code Ann. § 9-10-115, the judge correctly found that Bean is M.N.'s father pursuant to Ark. Code Ann. § 9-10-108(a)(6)(B). This section of the statute states:

> If the results of the paternity tests conducted pursuant to subdivision (a)(2) of this section establish a ninety-five percent (95%) or more probability of inclusion that the putative father is the biological father of the child, after corroborating testimony concerning the conception, birth, and history of the child, such shall constitute a prima facie case of establishment of paternity, and the burden of proof shall shift to the putative father to rebut such proof.

Here, two paternity tests established that Bean is M.N.'s father. Those tests, along with the corroborating evidence offered by Hale and the other witnesses at trial, constituted a prima facie case of the establishment of paternity. As such, the burden shifted to Bean to rebut that evidence, which he attempted to do by offering the Affidavit of Birth Out of Wedlock and birth certificate as evidence of Nichols's parentage of M.N. However, under the law applicable when Nichols executed those documents, they constituted pre-

sumptive evidence of paternity only, not conclusive evidence. Taking all of the evidence into account, the chancellor determined that Bean did not rebut the presumption that he is M.N.'s father. The chancellor's decision was not clearly erroneous.

Affirmed.