Gail H. Stone, Executive Director Arkansas Public Employees Retirement System 124 West Capitol, Suite 400 Little Rock, Arkansas 72201
Dear Ms. Stone:
I am writing in response to your request for an opinion regarding the proper Arkansas Public Employees Retirement System ("APERS" or "System") service to be credited to certain district court judges who became "state district court judges" under a pilot program created by Act 663 of 2007, the relevant portions of which are contained in Section 2 thereof, which is codified at A.C.A. § 16-17-1101 — 1107 (Supp. 2007).[1] The act established nineteen "pilot state district court judgeships" for twelve named counties or judicial districts of a county to participate in "a program of full-time pilot state district court judges." Id. at-1103. The act specifically designates the pilot judges as "state district court judges," id. at-1104(a), and provides that "the state shall pay [their] salary and benefits…. Id. at-1106(a).
As background for your questions, you note that several of these judges have been receiving two-for-one service credit as city or county elected officials under the provisions of A.C.A. § 24-4-521(b)(5), which is part of the body of law governing credited service and eligibility for benefits for members of APERS. You state further: "Under Act 663, however, the district judges covered by the pilot program *Page 2 
are now `state district court judges' with salary and benefits paid by the state." Against this background, you ask:
 1. Should the judges affected by Act 663 continue to be categorized as city or county elected officials under Ark. Code Ann. § 24-4-521(b)(5) ("elected public official other than Governor"), or should they be categorized under Ark. Code Ann. § 24-4-521(b)(6) as "an elected public official under the state division of the system?"
 2. If you determine that they should now be under the state division of the system, can these judges be switched from two-for-one service credit to one-for-one service credit without violating the constitutional prohibition on the impairment of contracts in Jones v. Cheney, 253 Ark. 926, 489 S.W.2d 785
(1973)?
RESPONSE
In response to your first question, I cannot be entirely certain that a pilot state district court judge should now be categorized under A.C.A. §24-4-521(b)(6) as "an elected public official under the state division of the system" because the legislature did not squarely address this matter when it required the State to pay their retirement benefits. The law on this issue would therefore benefit from legislative clarification. Pending such clarification, however, it is my opinion based on the analysis outlined below that these judges are probably properly categorized as public officials "under the state division" for purposes of A.C.A. § 24-4-521, governing credited service. The answer to your second question is unclear under current law because the Arkansas Supreme Court has not addressed the "impairment of contracts" proscription in the context of a retirement plan such as APERS. This issue may require resort to the courts for resolution.
Question 1 — Should the judges affected by Act 663 continue to becategorized as city or county elected officials under Ark. Code Ann.§ 24-4-521(b)(5)("elected public official other than Governor"), orshould they be categorized under Ark. Code Ann. § 24-4-521(b)(6) as "anelected public official under the state division of the system?"
The statute in question, A.C.A. § 24-4-521, governs the amount of service to be credited APERS members. As indicated by your question, the relevant *Page 3 
subsections of this statute distinguish between employment as an "elected public official under the state division of the system" (emphasis added) and employment as another elected public official other than Governor, state constitutional officer, or member of the General Assembly. The statute provides in relevant part:
 (5) Noncontributory employment as an elected public official other than Governor or an elected state constitutional officer or a member of the General Assembly or an elected public official under the state division of the system shall be credited as service at two (2) times the regular rate for crediting service, except that at least five (5) years of actual service shall be required to meet the retirement eligibility requirements of § 24-4-601 and 24-4-510 — 24-4-512, and at least five (5) years of actual service shall be required to meet the eligibility requirements of § 24-4-608.
 (6)(A) Noncontributory employment as an elected public official under the state division of the system other than Governor or an elected state constitutional officer or a member of the General Assembly by a person first elected to a public office covered by the Arkansas Public Employees' Retirement System prior to July 1, 1999, shall be credited as service at two (2) times the regular rate for crediting service, except that at least five (5) years of actual service shall be required to meet the retirement eligibility requirements of § 24-4-601 and 24-4-510 — 24-4-512, and at least five (5) years of actual service shall be required to meet the eligibility requirements of § 24-4-608.
 (B) Noncontributory employment as an elected public official under the state division of the system other than Governor or an elected state constitutional officer or a member of the General Assembly by a person first elected to a public office covered by the system on or after July 1, 1999, shall be credited at the regular rate for crediting service.
A.C.A. § 24-4-521(b) (Supp. 2007) (emphasis added).
You have indicated, through your question, that district court judges who are members of APERS have previously fallen under subsection24-4-521(b)(5), as *Page 4 
"elected public official[s] other than Governor or an elected state constitutional officer or a member of the General Assembly or an elected public official under the state division of the system." (Emphasis added.) Accordingly, those district judges who are noncontributing members of APERS have been receiving double service credit. Id. The issue is whether those district courts judges who are now "pilot state district court judges" pursuant to Act 663 of 2007, should be categorized as "elected public official[s] under the state division of the system," which would mean that those falling under A.C.A. § 24-4-521(b)(6)(B) would no longer receive two-for-one service credit.
In addressing this issue, I am of course guided by the primary rule of statutory construction, which is to give effect to the legislative intention. See generally Vanderpool v. Fidelity Casualty Ins. Co.,327 Ark. 123, 847 S.W.2d 707 (1997); Thomas v. Cornell, 316 Ark. 366,872 S.W.2d 370 (1994). Legislative intent is determined from the ordinary meaning of the language used, unless the language is ambiguous, in which case the review expands to include the subject matter, object to be accomplished, and other appropriate means that throw light on the subject. Macsteel, Parnell Consultants v. Ark. Ok. Gas Corp., 363 Ark. 22,210 S.W.3d 878 (2005). Applying these principles, we must first look to the relevant language of Act 663, which states simply: "The state shall pay the salary and benefits of pilot state district court judges created under this subchapter." A.C.A. § 16-17-1106(a) (Supp. 2008). The term "benefits" is undefined, but it is clear from the legislative history that this includes retirement benefits.[2] Unfortunately, Act 663 did not specifically address the particular matter of service credit for the "state district court judges." Compare A.C.A. § 24-4-750(c)(2) ("Active members of the Arkansas District Judge Retirement System ("ADJRS") on the date of the transfer [of ADJRS to APERS] shall continue to accrue the same program *Page 5 
of benefits received before the transfer[;]"[3] and (d) (Supp. 2007) (regarding service credit of district judges joining APERS after the transfer of ADJRS to APERS, providing that: "Each district judge joining [APERS] after the date of transfer shall be deemed an elected official of a city or county and shall receive service credit under §24-4-101(15)(B).")[4]
Because Act 663 fails to address the matter of credited service, it is necessary to look outside the act to attempt to divine the legislative intent. More specifically, because the issue is whether the legislature intended for these judges to be "under the state division of the system," see A.C.A. § 24-4-521(b)(5) and (6), it is necessary to determine who ordinarily is under the "state division." This in turn requires an analysis of the term "state division."
It appears that this term historically referred to one of the separate named division accounts set up under the "Arkansas Public Employees Retirement System Fund." See A.C.A. § 24-4-201 (Repl. 2000 and Supp. 2007). Subsection 24-4-201 is the codification of Section 4 ofAct 177 of 1957, as amended. A review of this body of law reveals the establishment of different divisions over the years for accounting purposes, and a corresponding separate accounting requirement, with a distinction drawn between the "State Division" and a division for non-state employers. See Acts 1959, No. 42, § 4 (creating the "County Division"); Acts 1961, No. 64, § 2 (adding a "Municipal Division"); Acts1997, No. 299, § 8 (adding a "School Division" and "Other Nonstate Division"); Acts 1999, No. 308, § 1 (continuing the "State Division, for the participation of state employees;" and changing the other divisions to a "the Local Government Division, for the participation of county employees, municipal employees, school employees, and certain other nonstate employees. . . .") It appears, further, that credited service was acquired under each division according to whether the member was employed by the State, county, or municipality. See A.C.A. § 24-4-605
(Repl. 2000) (codification of Acts 1957, No. 177, § 11, as amended by Acts 64, No. 1961, § 5: "In the event a member retires with *Page 6 
credited service arising from his employment by the state, a county, and a municipality, the public employer share of his annuity reserve shall be prorated between the state division, county division, and municipal division in accordance with the portions of his credited service acquired under each division.").
Subsection 24-4-201 was amended in 2001 to remove the former references to the "State Division" and non-state divisions. See Acts 2001, No. 67, § 2, and No. 151, § 11. It thus appears that there is no longer an express statutory separation of the APERS Fund into divisions, or an express requirement of separate accounting for different divisions. However, several other Code sections continue to refer to a "State Division" and a "Local Government Division." In my opinion, a court faced with the question would likely look to these other Code sections to gain insight into the proper interpretation of A.C.A. § 24-4-521(b)(5) and (6), and the reference therein to "an elected public official under the state division of the system." When read together, these other Code sections appear to reflect an assumption that employer contributions will be paid into either the "State Division" or the "Local Government Division," depending upon whether such contributions are made by the State, or instead by a "participating public employer."[5] For instance, A.C.A. § 24-4-202(c)(1) (Supp. 2007) states that "[i]n the case of the Local Government division . . ., each participating public employer shall pay into the [APERS] Fund such sums of money as are necessary to provide the participating public employer's contributions…. " Also, a statute that calls for reduced annuities in certain circumstances refers to "the sum of the balances in the State Division of [APERS] of the employers' accumulation account and the retirement reserve account…." A.C.A. § 24-4-208(a)(1) (Supp. 2007). This statute similarly refers to "the sum of the balances in the Local Government Division of the employer's accumulation account." Id. at (b)(1). Another statute confirms, moreover, that the "employer's accumulation account" is comprised, respectively, of contributions made by the state and the participating public employers. A.C.A. §24-4-402(b)(2) and (c)(2) (Supp. 2007) ("The state's contributions, when paid into the [APERS] Fund, shall be credited to the employers accumulation account[;]" and "[t]he participating public employers' contributions, when paid into the fund, shall be credited to the employers' accumulation account."). Finally, A.C.A. § 24-4-206 (Repl. 2000), *Page 7 
requires the use of state turnback revenues to meet any unfunded liabilities with respect to "county or municipal employee members of the Local Government Division….) Id. at (b)(6). This statute in effect requires the System to track the employer contributions for "Local Government Division" members.
Additionally, and perhaps most significant in addressing this question concerning the amount of service to be credited an official "under the state division of the system," the statute noted above regarding reduced annuities, A.C.A. § 24-4-208, specifically envisions the payment of annuities "from the State Division of the retirement reserve account." or "from the Local Government Division of the retirement reserve account." Id. at (a)(1) and (b)(1).
Thus, notwithstanding that there is no longer a statutorily mandated "State Division" for accounting purposes, we can extrapolate from the above statutes that subsection 24-4-521(b)'s reference to those who are "under the state division of the system" likely encompasses those on whose behalf the State pays contributions, and whose annuities are paid by the State. Given the State's clear obligation to pay the pilot state district court judges' retirement benefits, see A.C.A. § 16-17-1106(a) (Supp. 2007), I assume these officials are included in calculating the State's employer contributions. See A.C.A. § 24-4-402(b) (Supp. 2007). The State obviously must also pay their annuities. The legislature is presumed to have been aware of this information when it required the State to pay the pilot state district court judges' retirement benefits.See generally Otis v. State, 355 Ark. 590. 614, 142 S.W.3d 615 (2004) (observing that "in construing a statute, [the Arkansas Supreme Court] will assume that the General Assembly, in enacting it, possessed the full knowledge of prior legislation on the same subject.).
Accordingly, although the law on this issue would benefit from legislative clarification, it is my opinion pending such clarification that the pilot state district court judges are probably properly categorized as public officials "under the state division" for purposes of A.C.A. § 24-4-521, governing credited service.
Question 2 — If you determine that they should now be under the statedivision of the system, can these judges be switched from two-for-oneservice credit to one-for-one service credit without violating theconstitutional prohibition on the impairment of contracts in Jones v.Cheney, 253 Ark. 926, 489 S.W.2d 785 (1973)? *Page 8 
It should first be noted that if the judges indeed are now "under the state division of the system" as posited above, such that A.C.A. §24-4-521(b)(6) calls for one-for-one service credit, Act 663 in my opinion nevertheless in no way affects their prior service as city or county elected officials.[6] As explained above, that service "shall be credited as service at two (2) times the regular rate for crediting service." Id. at (b)(5). It is a basic tenet of statutory construction that legislation is presumed to operate only prospectively unless the General Assembly expressly or by necessary implication indicates otherwise. Bean v. Office of Child Support Enforcement, 340 Ark. 286,296-97, 9 S.W.3d 520 (2000); Employers Surplus Insurance Co. v. MurphyOil USA, Inc., 338 Ark. 299, 993 S.W.2d 481 (1999). Nothing inAct 663 of 2007 suggests that the legislature intended to give retroactive effect to its designation of the pilot state district court judges. Accordingly, I believe these judges clearly retain the service credit that they accrued prior to the enactment of Act 663.
The question, therefore, is whether the General Assembly may change the service credit from two-to-one to one-for-one prospectively, i.e., as to service accrued after the enactment of Act 663 of 2007, without violating the "impairment of contracts" proscription.
This would present a case of first impression for the court as it has not had occasion to address this constitutional proscription in the context of APERS. The proscription is set forth in Article 2, Section 17
of the Arkansas Constitution ("No . . . law impairing the obligation of contracts shall ever be passed,") as well as Article 1, Section 10 of the U. S. Constitution ("No State shall . . . pass any Law impairing the Obligation of Contracts."). As indicated by your question, the Arkansas Supreme Court has held that legislation violates this constitutional principle if it operates retroactively so as to divest previously existing contractual rights, and specifically rights arising under a public retirement plan. See, e.g., Jones v. Cheney, 253 Ark. 926,489 S.W.2d 785 (1973); Pyle v. Webb, 253 Ark. 940, 489 S.W.2d 796 (1973). Several other courts have explained this concept of "vesting" as follows: *Page 9 
 Ordinarily,… "`vesting' refers to a provision in a retirement plan whereby the member's right to a benefit becomes effective upon fulfillment of specified qualifying conditions, such as service for a certain period of time, which right is not forfeited by separation from service prior to the prescribed age for retirement." Fund Manager v. City of Phoenix Police Dept., 151 Ariz. 487, 489, 728 P.2d 1237, 1239 (Ariz.App. 1986) (quoting Kraus v. Bd. of Trustees, 72 Ill.App.3d 823, 390 N.E.2d 1281 (1979). However, for the purposes of determining the creation of a legally protected right, `vest' in a legal sense . . . refers to a contractual right to and interest in a pension that may be upheld at law.'" Id.
Calabro v. City of Omaha, 247 Neb. 955, 966-77, 531 N.W.2d 541 (1995).
Cheney and Pyle reflect the court's adoption of the theory that a public employee, by accepting the terms and conditions of a law that provides for pensions to participating employees, enters into a contractual relationship with the public entity that passed the law. See Cheney,253 Ark. at 931, citing Anders v. Nicholson, 111 Fla. 849, 150 So. 639
(1933). Under the pertinent terms of that "contract," it is agreed that the employee will be allowed to participate in the retirement plan while employed in his or her public position, and that if the employee meets the plan's vesting requirements, he or she will be entitled to receive the plan's prescribed benefits. Id. See also Op. Att'y Gen. Nos. 95-247
and 95-071. Under this line of cases, a subsequently enacted law that impairs or divests these assured benefits will be challengeable under Ark. Const. art 2, § 17 and U.S. Const. art. 1, § 10.
In addition, it is generally held, without regard to these constitutional provisions concerning "contracts," that a state may not divest a person of "vested rights" through the enactment of subsequent legislation. This prohibition is applicable to the states by virtue of the Fourteenth
Amendment to the United States Constitution. See generally 16A C.J.S. Constitutional Law § 229. The court in Cheney, supra, observed that "[r]ights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest." 253 Ark. at 936, quoting 16 C.J.S. ConstitutionalLaw § 2 1 5 .
While the Arkansas Supreme Court has thus recognized that pension or retirement plans can give rise to "vested rights," in a legal sense, that cannot be constitutionally *Page 10 
impaired or divested, it has not had occasion to address this complicated matter in the context of a retirement plan such as APERS, which is a mandatory, non-contributory plan as to most of these pilot state district court judges.[7] This observation regarding APERS is necessary because in subsequent cases explaining Cheney, the court has made much of the fact that the retirement system in issue there included voluntary contributions from the individuals involved. In Robinson v. Taylor,342 Ark. 459, 29 S.W.3d 691 (2000), for instance, the court observed:
 [T]he retirement plan at issue in Jones v. Cheney was based on voluntary contributions from member employees. We held that such a system represents delayed compensation for services rendered in the past due under a contractual obligation inuring to the employee's benefit and is not a gratuitous allowance in which the pensioner has no vested right. Id. The retirement benefit at issue in this case, on the other hand, is to be paid entirely from the city's general fund. Ark. Code Ann. § 24-12-123. As Ms. Robinson contributed no funds, the retirement benefit was merely a gratuitous allowance. Arkansas Tech University v. Link, 341 Ark. 495, 17 S.W.3d 809
(2000). A pensioner has no vested right in a mere gratuitous allowance. Jones v. Cheney, supra.
342 Ark. at 463. See also McCarty v. Board of Trustees, 45 Ark. App. 102,117, 872 S.W.2d 74 (1994) ("In Jones v. Cheney, …, the court said that where the legislature of a state creates a retirement system to which employees contribute, the legislature may not constitutionally impair the rights of those employees by legislation enacted after their rights become vested."); Pyle, supra, 253 Ark. at 943-44 (holding that a retirement system allowance financed over a period of years by joint contributions of employer and employee represented "compensation" rather than a "mere gratuity," and thus was a "vested right" which could not be altered by the operation of subsequent laws.) *Page 11 
Arkansas therefore appears to be among the majority of states that have abandoned the "common law gratuity theory" of pension rights, at least with respect to contributory plans. See Simpson v. N.C. Local Gov'tEmployees' Retirement Sys., 88 N.C. App. 218, 222, 363 S.E.2d 90
(1987) (noting the "kaleidoscope of multifarious and conflicting views" of pension rights, and briefly reviewing five different approaches, including the "traditional common law" view that "public employee pensions are gratuities creating no contractual rights until the member satisfies all of his retirement requirements.") According to my research, a number of jurisdictions have recognized a trend away from the concept of a pension as a "gratuity" to an approach that accords more protection to pension rights, sometimes under the view that public employees' retirement plans are contractual in nature because they offer an inducement to employees. See, e.g., Pineman v. Oechsline,494 F. Supp. 525, 539 (D.C. Conn. 1980) (postulating that "a highly structured and formal pension plan," such as Connecticut's in which the employees must participate, "gives rise to obligations and rights which are contractual in nature."); Masse v. Public Employees Retirement Sys.,87 N.J. 252, 260, 432 A.2d 1339 (1981) (observing that "legislative intent that the governmental pension constitutes compensation for services rendered over a period of time has been accorded substantial judicial recognition. ….`[T]he basic philosophy underlying pensions to public officers fluctuates between the early view that they were mere gratuities bestowed by the sovereign in recognition of meritorious service previously rendered and the more modern concept that they are some form of delayed wages or salary to compensate the employee during his declining years when he is apt to be less productive for his long and faithful service.'" Citations omitted.).
The North Carolina Court of Appeals in Simpson v. N.C. Local Gov'tEmployees' Retirement Sys., supra, identified five different approaches to pension rights as follows:
 [A] few jurisdictions still follow the traditional common law in holding that public employee pensions are gratuities creating no contractual rights until the member satisfies all his retirement requirements. According to this view, such pension benefits are mere expectancies, modifiable or revocable at the whim of the legislature….
 Apparently, a majority of courts have in recent years abandoned the common law gratuity theory in favor of an approach which accords more protection to such pension rights. The Minnesota case *Page 12 Christensen v. Mpls. Mun. Emp. Retire. Bd.. 331 N.W.2d 740
(Minn. 1983) represents the second approach reviewed here. In this case, the Supreme Court of Minnesota declared that "a public employee's interest in a pension is best characterized in terms of promissory estoppel." The court went on to imply in law a contract to enforce the state's promise of pension benefits that had been reasonably relied upon.
 Third, a large number of states have construed public pension plans as giving rise to contractual rights — even in the absence of a clear statement of legislative intent to contract. See Pineman v. Oechslin, 494 F. Supp. 525 (D. Conn. 1980), for cases cited therein. Some of these states have held that such pension rights vest unconditionally at the moment of employment. See, e.g., Yeazell v. Copins, 98 Ariz. 109, 402 P.2d 541 (1965). Other states follow the so-called California rule according to which such pension rights, though contractual, may be modified by the legislature where necessary and reasonable, provided that any disadvantages to employees are offset by comparable new advantages. See, e.g., Allen v. Bd. of Admin., 34 Cal.3d 114, 192 Cal.Rptr. 762, 665 P.2d 534 (1983). Courts have generally been more likely to find vested contractual rights arising out of voluntary plans than out of mandatory ones and, further, have generally shown themselves more solicitous of employees who have already retired than of those who have not. See Annot., 52 A.L.R.2d, supra, at 441-43.
 Fourth, at least two jurisdictions, however, have stubbornly rejected the contractual approach….
88 N.C. App. at 222-23.
The fifth approach, according to the North Carolina court, holds that "a state does not automatically run afoul of the Contract Clause of the U.S. Constitution by impairing pension rights[,] and that the impairment may be constitutional "because it was reasonable and necessary to serve an important public purpose." Id. at 224.
Because our court has not addressed the matter, we do not know to what extent it would ascribe to the view that the non-contributory APERS plan creates contracts *Page 13 
between the state and its employees who are members of the system. I believe the answer to your second question will initially depend upon the court's approach to that issue. Cheney and Pyle can be cited for the proposition that the court is among those in the few other jurisdictions that embrace the common law theory as to such a plan, meaning that the plan creates no contractual rights until the member satisfies all of his or her retirement requirements. But Cheney and Pyle are arguably distinguishable on their facts in that the court was not addressing a highly structured state-created system comparable to APERS. In this regard, it may also be relevant to note that in Arkansas Tech Universityv. Link, 341 Ark. 495, 17 S.W.3d 809 (2000), the court rejected a claim for certain health insurance benefits by retirees based at least in part on the fact that the benefits were not created by statute.341 Ark. at 505-506 (distinguishing Cheney and a Pennsylvania case relied upon in Cheney, in part on the basis that the retirement plans in those cases were established by the respective state legislative bodies). I do not know how much significance to attach to this distinction, but it conceivably suggests that the court might be more receptive to an "impairment of contracts" argument in the context of a state-created plan such as APERS.
Determining that a contractual relationship exists between APERS and its members does not necessarily dispose of the question presented regarding the change in service credit. If it is assumed that the court would take the position that the APERS plan at issue gives rise to constitutionally protected contract rights, I believe there may still be some question whether Act 663 of 2007 has the effect of impairing any such rights. The most obvious argument in favor of impairment applies to those judges who had sufficient years of service prior to the enactment of Act 663 to qualify for a "vested termination annuity." See A.C.A. § 24-4-510 (Supp. 2007). See also A.C.A. § 24-4-508 (Supp. 2007) (setting forth the general eligibility requirements).[8] The contention would be that having vested in APERS, *Page 14 
these persons have a constitutionally protected "vested right" to future double service credit. Cf. Cheney, supra (finding a contractual relationship between the retirement system at issue and the members of the system, and relying upon Hickey v. Pittsburgh Pension Board,106 A.2d 233 (1954), which held that the pensioner's rights became "vested" when he fulfilled the plan's service requirements) and Pyle,supra, 253 Ark. at 943 (quoting Coco v. Miller, 193 Ark. 999 (1937), where the court stated:" . . . rights conferred by statute are determined according to statutes which were in force when the rights accrued, and are not affected by subsequent legislation. . . .") According to A.C.A. § 24-4-508(b)(2) (Supp. 2007), the APERS benefit "shall be based on credited service in the system and on the final average compensation in the system." Because the benefit formula includes years of service, the argument would be that the double service credit is part of the prescribed benefit that cannot be disturbed as to those who have vested in the plan.
I cannot predict with any certainty how our court would approach this matter. The constitutional issue may be framed as follows:
 `Where . . . it is claimed that the contract clause prohibits a state's statutory modification of its own obligations, the court must determine whether contractual obligations within the purview of the contract clause exist; if so, whether the state legislation . . . impaired those obligations; and if there is an impairment of contract, whether it is forbidden by the Constitution.' Pineman v. Oechslin, 494 F.Supp. 525, 538 (D.Conn. 1980).
Davis v. Annapolis, 98 Md. App. 707, 713, 635 A.2d 36 (1994).
With regard to the existence of a protected contractual obligation in connection with double service credit under APERS, it may be relevant to note that the court in Cheney appeared to have been influenced by the fact that the rights at issue were "clearly defined" in the relevant retirement law. In that case, a former state official named Cheney had met all of the requirements under Act 148 of 1965 to receive an annuity, with the exception of being the age at which his benefits would begin. The court held that a change in the service requirement, enacted underAct 167 of 1967, could not constitutionally apply to Cheney because it was clear under *Page 15 
the 1965 act that he was assured of his annuity when he reached age sixty-five. The court observed that "Cheney's rights were clearly defined in Act 148 of 1965 and his rights became consummate when he fulfilled the service requirements created by the Act." 253 Ark. at 936. The court specifically rejected the notion that "he should be deprived of his rights fixed by the 1965 statute, — rights to which he was contractually entitled under that act to enjoy when he became 65."Id. at 937. Similarly, in Pyle, the annuity benefit to which the former member was entitled upon his application for payment was clear under the relevant plan. The court held that his right to the annuity vested prior to the passage of an act that that placed a limitation on the annuity, and that he could not be deprived of his "contractual benefits."253 Ark. at 944.
The relevant statutes concerning credited service under APERS may not be so clear in establishing the state's contractual obligation to provide double credit for members' future service. In order to establish a contractual "impairment" as a result of the change in service credit, it may be necessary to present evidence that the two-for-one credit was part of the expected benefit. See, e.g., Pineman, supra, 494 F. Supp. at 541
(noting the plaintiffs' "strong reliance interest" sufficient to support a contract). I am consequently unable to confidently predict whether or not those judges who had vested in APERS by having met the requisite service requirements before Act 663 of 2007 was enacted have a constitutionally protected "vested right" to receive the two-for-one service credit for their future service. A definitive answer to this question will only be provided by the Arkansas Supreme Court.
Finally, it is necessary to address those judges who had not yet met the service requirements to vest in APERS when Act 663 was enacted (the so-called "non-vested" judges). If it is assumed that APERS gives rise to contractual rights, then these judges may also contend that they have a "vested right" to receive the two-for-one service credit for their future service. It seems clear, however, that the success of their claim would depend initially upon their ability to prove that their rights under APERS already "vested," for Contract Clause purposes, even though they did not yet qualify for a "vested termination annuity" under the statutes. This contention would be countered with the suggestion inCheney and Pyle that our court equates legal "vesting," in the sense of creating protected contractual benefits, with vesting under the particular provisions of the retirement plan. This would be consistent with the view in some other jurisdictions. See, e.g., Baker v. OklahomaFirefighters Pension, 1986 OK 8, 718 P.2d 348 (1986) (and cases cited therein). Consistent with this view, my immediate predecessor opined that legislation *Page 16 
removing certain employees from their local retirement plans and placing them in APERS did not impair any contractual rights of employees who did not vest in the system as of the date of transfer to the new system. In Op. Att'y Gen. 2003-318, it was opined that the contractual rights of public employee participants in a pension plan can take two forms: "For employees who have not yet vested in the system, the contractual right is not a right to vest in the retirement system. Rather, it is simply a right to participate in the system while eligible and while the system exists. For employees who have vested in the system, the contractual right is a right to receive the benefits that were promised upon vesting." Id. at 3 (emphasis added).[9] Under this view of contractual rights, those not meeting the service requirements to vest in APERS have no constitutional objection to a change in service credit.
I believe it may bear noting, however, that neither Cheney nor Pyle
involved an "impairment of contracts" claim by a class of beneficiaries that had not yet met the plan's vesting requirements. Limited to their facts, Cheney and Pyle stand for the proposition that one who fulfills the statutory conditions to qualify for the benefit cannot constitutionally be divested of his "vested right" to the benefit. Arguably, the court was not addressing the issue of whether constitutionally protected "vested rights" might arise at some earlier point.
I note, additionally, that in contrast to the view that no contractual right exists until the pension or retirement benefit vests, courts in several jurisdictions have held that public employees' pension rights vest upon employment, although the government may under certain circumstances modify benefits "so long as the changes do not adversely alter the benefits, or if the benefits are adversely altered, they are replaced with comparable benefits." Calabro v. City of Omaha, 247 Neb. 955,967, 531 N.W.2d 541 (1995) (citing cases from California, Idaho, Maryland, and Wisconsin); Pineman, supra, 494 F. Supp. at 545 (noting that "although pension rights are only vested at the time of retirement, a `limited vesting' occurs upon commencement of employment . . .," citingPolice Board v. Bills, 148 Colo. 383, 366 P.2d 581 (1961). *Page 17 
The few Arkansas cases in this area suggest that the "non-vested" judges have no contractual claim to the two-for-one service credit. But until our court expressly addresses these issues, including the "impairment of contracts" proscription in the context of APERS, I cannot definitively answer your second question.
Assistant Attorney General Elisabeth A. Walker prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL Attorney General
[1] Act 663 is a comprehensive act comprised of 56 sections addressing various matters pertaining to city courts and district courts, including the consolidation of city courts with district court — effective January 1, 2012 — the collection and management of fines, and certain jurisdictional matters. Regarding the pilot program, Act 663 expresses the intent to begin analyzing a state-funded system "by establishing a pilot program that creates a limited number of state-funded pilot state district court judgeships and a process for the study and consideration of establishing additional district courts in the future." A.C.A. §16-17-1101(8) (Supp. 2007).
[2] See "Report of the Legislative Task Force on District Courts," which was presented to the Senate and House interim judiciary committees on September 1, 2006, recommending, inter alia, a "cost-sharing formula" in which the state and local governments within a pilot program county would "share equally the salary of the district judge with the state paying all benefits, including retirement, FICA, and insurance."
Consistent with this recommendation, the county and town or city having a pilot district judge must pay to the state their proportionate share of one-half of the judge's salary. See A.C.A. § 16-17-1106(a) and (b)(1)(A) (Supp. 2008) ("The state shall pay the salary and benefits of pilot state district court judges created under this subchapter…. Each county and town or city that has a pilot state district court judgeship created under this subchapter shall pay to the state an amount equal to its proportionate share of one-half of the base salary established by law for that county and town or city's pilot state district court judge.").
[3] The ADJRS, see A.C.A. §§ 24-8-801 — 824 (Supp. 2007), was abolished and transferred to APERS effective July 1, 2007. See Acts 2007, No. 177, § 12 and A.C.A. § 24-4-750(a) (Supp. 2007).
[4] Subsection 24-4-101(15)(B) provides: "Any member first hired on or after July 1, 2005, to a covered position whose service is credited at a rate other than that defined in § 24-4-101(2) ["one (1) month for each month of service"] shall accrue that credit on no more than ten (10) actual years of service." Thus, as an "elected official of a city or county," see A.C.A. § 24-4-750(d), supra, a district judge who joins APERS after July 1, 2007, will receive service credit at two (2) times the regular rate, see A.C.A. § 24-4-521(b)(5), supra, on no more than ten (10) actual years of service.
[5] The term "participating public employer" is defined in relevant part as:
 Any county [or] municipality… in the state whose employees are included in the membership of the Arkansas Public Employees Retirement System[.] A.C.A. § 24-4-101(29)(A) (Supp. 2007).
[6] I have no information regarding the election of the particular judges in question, but it appears that any who were first elected prior to July 1, 1999, will continue to receive two-for-one service credit pursuant to A.C.A. § 24-4-521(b)(6)(A) (Supp. 2007).
[7] APERS became contributory in 2005. See A.C.A. 24-4-1101 et seq.
(Supp. 2007). It is my understanding that at least one of the pilot state district court judges is a contributory member of APERS by virtue of previous membership in ADJRS, which was established by Act 1374 of 2003, and subsequently transferred to APERS in 2007. See n. 3, supra. Because this judge had not served the requisite period to have vested in APERS before Act 663 of 2007 was enacted, it would appear that the resolution of your question will not bear on his or her credited service. See
discussion, infra.
[8] Subsection 24-4-508 provides that a member may retire provided the member has:
 (1) Twenty-eight (28) or more years of credited service regardless of age;
 (2) Attained or attains age sixty (60) and has twenty (20) or more years of actual contributory service commenced prior to January 1, 1978; or
 (3) Attained or attains age sixty-five (65) and has five (5) or more years of actual service, except for a member of the General Assembly who must have ten (10) or more years of actual service if he or she only has service as a member of the General Assembly.
A.C.A. § 24-4-508(a) (Supp. 2007).
[9] I note that in making this statement, my predecessor did not mention the possible distinction between voluntary, contributory plans and mandatory, non-contributory plans. As I explained in Opinion 2008-052, however, the court has emphasized the voluntary and contributory nature of a plan when addressing this issue of vested contractual rights. Id. at 10.